IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,           )
                                     )
              Plaintiff,             )
                                     )      Civil No. 10-765
     VS.                             )
                                     )      June 15, 2011
ISHMAEL JONES,                       )
 A pen name                          )
                                     )
              Defendant.             )
_____   )

REPORTER'S TRANSCRIPT

MOTIONS HEARING

BEFORE:        THE HONORABLE GERALD BRUCE LEE
               UNITED STATES DISTRICT JUDGE

APPEARANCES:

 FOR THE PLAINTIFF: OFFICE OF THE U.S. ATTORNEY
                    BY: KEVIN MIKOLASHEK, ESQ.
                    DEPARTMENT OF JUSTICE
                    BY: MARCIA BERMAN, ESQ.
                    CENTRAL INTELLIGENCE AGENCY
                    BY: ANNA PECKAM

 FOR THE DEFENDANT: LECLAIR RYAN
                    BY: LAURIN MILLS, ESQ.
                        C. MATTHEW HAYNES, ESQ.


                        ---

OFFICIAL COURT REPORTER: RENECIA A. SMITH-WILSON, RMR
                         U.S. District Court
                         401 Courthouse Square, 5th Floor
                         Alexandria, VA  22314
                         (703)501-1580

EXHIBIT
C

## INDEX

ARGUMENT BY THE PLAINTIFF    3,    17

ARGUMENT BY THE DEFENDANT    8

RULING BY THE COURT          18

---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Thereupon, the following was heard in open

2   court at 10:04 a.m.)

3          THE CLERK:  1:10 civil 765, United States of

4   the America versus Ishmael Jones, et al.

5          Would counsel please note your appearances

6   for the record.

7          THE COURT:  Good morning.

8          MR. MILLS:  Good morning, Your Honor.  Laurin

9   Mills and Matt Haynes on behalf of Mr. Jones.

10          THE COURT:  Good morning.

11          MR. MIKOLASHEK:  Good morning, Your Honor.

12   Kevin Mikolashek from the U.S. Attorney on behalf of the

13   United States.  Joining me, Your Honor, is Anna Peckam

14   from the Agency.  Also joining me is a Marcie Berman from

15   the DOJ civil division.

16          Ms. Berman has been admitted pro hac vice and

17   with the Court's permission will be delivering the

18   arguments in this case.

19          THE COURT:  All right.  Ms. Berman, you may

20   proceed.

21          It's always helpful at the outset to tell me

22   what the issue is.

23          MS. BERMAN:  Absolutely, Your Honor.  Good

24   morning.

25          THE COURT:  Good morning.

1    MS. BERMAN:  The issue on the Government's

2  motion today is whether there are any material facts in

3  dispute precluding summary judgment as to Mr. Jones'

4  liability for breaching his secrecy agreement, and the

5  answer to that question is no.

6    It is uncontroverted in this case that

7  Mr. Jones signed a secrecy agreement that required him to

8  submit his manuscript for prepublication review and that

9  required him not to publish it unless and until he

10  received the Agency's written approval.

11    It is also uncontroverted that Mr. Jones

12  submitted a manuscript to the prepublication review

13  process and that the Agency denied him permission to

14  publish the manuscript.

15    THE COURT:  What remedy, if any, did he have

16  following the denial by the Agency of his request for

17  publication?

18    MS. BERMAN:  I'm sorry.  What was the

19  beginning of your question?

20    THE COURT:  What remedy, if any, did

21  Mr. Jones have when the Agency denied his request for

22  permission to publish his book?

23    MS. BERMAN:  Your Honor, Mr. Jones had the

24  remedy of coming into federal court and seeking judicial

25  review of that PRB decision.  That is a remedy that has

1    been in existence since the *Marchetti* case, and he

2    clearly had it available to him, and he did not pursue

3    it.

4                THE COURT:  So, is there any question that he

5    went on and published the manuscript?

6                MS. BERMAN:  There is no question that he

7    went ahead and published the manuscript.

8                THE COURT:  All right.

9                MS. BERMAN:  That's correct.  That is

10   completed admitted.

11               In fact, in the book itself, Mr. Jones boosts

12   about the fact that he published it against the expressed

13   denial of approval from the Agency.  So, it's definitely

14   not in dispute.

15               Mr. Jones' defenses in this case that he has

16   raised are meritless.  Whether the book contains

17   classified information is irrelevant to Mr. Jones'

18   liability for breaching his contract.

19               THE COURT:  Does the agreement require

20   nondisclosure of only classified information?  Doesn't

21   the law require you not disclose classified information?

22               MS. BERMAN:  Your Honor, the cases that have

23   held that have based it on the author's First Amendment

24   rights.  It's not a contractual obligation.

25               It's -- there's nothing in the agreement that

1    requires the Government to only deny approval of

2    classified information.  That's a First Amendment right

3    that the courts have found to exist for the authors.

4              And so, Mr. Jones' argument that he's raised,

5    his defense that the Government breached the contract

6    first by denying permission of what he claims to be

7    unclassified information is absolutely meritless.

8              There's nothing in the contract that requires

9    that.  All the cases have held it's a First Amendment

10   right.  All of those courts would have been required by

11   the Doctrine of Constitutional Avoidance to find it in

12   the contract if it existed rather than to reach out and

13   base their decisions on the First Amendment.

14             And, a further reason for rejecting this

15   defense, Your Honor, is that it really would nullify the

16   force and effect of the secrecy agreement and be entirely

17   contrary to the *Snepp* case.  Because if this defense

18   exists, then an author can simply submit a manuscript for

19   a prepublication review, get in -- once it's denied, the

20   author would -- could contend, like Mr. Jones is doing

21   here, that that's a complete defense and excuses

22   compliance with the secrecy agreement.

23             The author would go ahead, publish the book.

24   You'd have the unauthorized disclosure of potentially

25   classified information that the courts have held, you

1    know, can't happen.  And there would be -- and the United

2    States would not be able to even sue for breach of

3    contract because, as Mr. Jones is claiming, it would be a

4    complete defense.  And so that defense should definitely

5    be rejected.

6              Your Honor, so the essential facts here are

7    uncontroverted, and the harm to the Government is also

8    uncontroverted.

9              You know, in the *Snepp* case, the Court found

10   that the Government had been irreparably harmed by the

11   unauthorized publication of Mr. Snepp's book.

12             And here, you know, we rely on that holding.

13   We also submitted a declaration establishing the harm in

14   this case.  And in fact, the harm is clearer here than it

15   was in *Snepp* because here we have a covert officers whose

16   affiliation with the Government, with the CIA remains

17   classified to this day, who published a book about his

18   experiences, you know, as an officer operating under what

19   he called deep cover when the CIA expressly denied him

20   permission to do so.

21             THE COURT:  All right, I think I understand

22   your position.

23             MS. BERMAN:  Thank you.

24             THE COURT:  Let me hear from the other side

25   and I'll give you a chance to respond.

1  MR. MILLS:  Good morning, again, Your Honor.

2  THE COURT:  Good morning.

3  MR. MILLS:  Your Honor, the issue in this

4  case is whether the Government can enforce a contract

5  that it breached first.  And the rule under Virginia law

6  and under federal law is that it cannot.

7  That is a legitimate defense to the contract,

8  and he has a First Amendment right to be able to publish

9  nonclassified information.

10  He did not waive his First Amendment rights

11  by entering into this agreement.  And the secrecy

12  agreement itself, which is Exhibit A to the complaint, I

13  refer the Court to the final paragraph -- the final

14  sentence of paragraph eleven which says, "Nothing in this

15  agreement prevents -- constitutes a waiver on any part of

16  any possible defense I may have in connection with either

17  civil or criminal proceedings which may be brought

18  against me".

19  So, there is a no waiver provision of any

20  defense.  Prior breach is an unquestionable defense under

21  Virginia law --

22  THE COURT:  What do you say is the prior

23  breach, Mr. Mills?

24  MR. MILLS:  What happened here, Your Honor,

25  is that Mr. Jones is a man who spent his entire career in

1    the government, in the Marines and then 15 years as a

2    covert officers.  This is a guy who follows the rules.

3                THE COURT:  My question was what was the

4    breach?

5                MR. MILLS:  The breach was, he went

6    through -- unlike *Snepp* and *Marchetti*, he went through

7    the prepublication review process for 18 months.  He

8    submitted his manuscript multiple times.  And if I may --

9                THE COURT:  And my understanding is that they

10   gave it back to him with some feedback and he made

11   another submission.  Is that right?

12               MR. MILLS:  He made multiple submissions and

13   this is the final feedback.  And if I can ask the court

14   security officer to hand this up.  This is the -- this is

15   the final feedback he got from the Government.

16               THE COURT:  So, is it your view that when he

17   was unhappy with the response he had a right to publish

18   it?  That was the end of the process?

19               MR. MILLS:  No, that's not what happened

20   here.

21               THE COURT:  No, my question was very precise.

22   He had a right to come into federal court to challenge

23   the Agency's denial of prepublication; is that right?

24               MR. MILLS:  That's certainly one of his

25   option.

1           THE COURT:  That was a legal right he had, is

2  that right?

3           MR. MILLS:  That's correct.

4           THE COURT:  He did not exercise it?

5           MR. MILLS:  No, he exercised his option.

6  This is a contract.  This is a contractual agreement.

7  It's the same -- he has the same right if you hired

8  someone to paint your house.

9           THE COURT:  This is not like painting your

10  house.

11           So you're saying that he submitted for

12  prepublication review multiple times.  He was unhappy

13  with the result.

14           Rather than complete the process by bringing

15  a lawsuit in federal court, he unilaterally made the

16  decision to release the book on his own; is that right?

17           MR. MILLS:  I think after 18 months of going

18  through the process, with them denying him the right to

19  publish anything but footnotes, as you'll see in the

20  exhibit I handed up and going six months through an

21  appeal process where the Government's own regulations say

22  they're supposed to complete it in a month, he exercised

23  his rights under the First Amendment to publish this.

24           THE COURT:  So, then your view is that the

25  First Amendment is self executing, that covert agents can

1    make their own judgment to publish despite the Agency's

2    denial of that request while they're in the process of

3    reviewing the publication; is that right?

4              MR. MILLS:  Your Honor, he takes a risk by

5    doing that.  And --

6              THE COURT:  Well, all agents take a risk by

7    doing that, don't they?

8              MR. MILLS:  That's correct and --

9              THE COURT:  So then the agreement would have

10   no effect if the effect of it could be that the agent on

11   their own could just decide to release the book; is that

12   right?

13             MR. MILLS:  That's not true, Your Honor.

14             THE COURT:  Well, help me with what was the

15   Agency supposed to do under this circumstance where he

16   unilaterally released the book.  There was no chance now

17   to further review it, to give him any additional

18   feedback?  So, what was the Agency to do now?

19             MR. MILLS:  The Agency should do exactly what

20   it's doing here.  Is that if it thinks that he -- that

21   he -- that they denied him the right to publish

22   legitimately classified information, they have one --

23   they have two choices.  They can prosecute him criminally

24   because it's a crime to do that.  Or second they can do

25   what they're doing here in an attempt to impose a

1   constructive trust.  And so, they can do that.

2             If he had gone to federal court, we would be

3   having the same issue we're having now, justify whether

4   it's classified or not.  When --

5             THE COURT:  Well, it is your view that the

6   secrecy agreement only affects classified information?

7             MR. MILLS:  Absolutely.

8             THE COURT:  Only classified information?

9             MR. MILLS:  The way the secrecy agreement is

10  written is a little bit convoluted.  It say you can't

11  publish in derogation of an executive order that is

12  listed in there.

13            Now, I can't find the executive order

14  anywhere.  I think the executive order is classified.

15  But every case that's ever talked about it has said that

16  you can only published classified information.

17            But, you can only --

18            THE COURT:  Say it again.

19            MR. MILLS:  The executive order referenced in

20  the secrecy agreement says you can't publish anything

21  that's in violation of this executive order.

22            I have not been able to find online anywhere

23  this executive order, and the Government has never

24  submitted it as part of the papers in this.  So, I

25  believe the executive order itself is classified, but I

1   can't swear to that.

2           But, the way the courts have interpreted this

3   agreement it's been multiple times, is that the

4   Government can only deny him the right to publish what's

5   classified.  And, in fact, that's what the Agency's own

6   regulations say.

7           THE COURT:  All right.  Well, in this case,

8   there's no dispute about the fact that he submitted the

9   item for prepublication review; is that right?

10          MR. MILLS:  That's correct.

11          THE COURT:  And there's no dispute of fact

12  that he decided to publish it without Agency permission.

13          MR. MILLS:  That's correct.  After 18 --

14          THE COURT:  All right.  So, this is a pure

15  legal question then on the issue of your defense, that is

16  whether the Government breached the agreement by failing

17  to approve of his request to publish his manuscript.

18          MR. MILLS:  No, I think it's a factual issue

19  about whether the -- whether the -- whether anything in

20  this very long book was legitimately classified.  And, we

21  have more than enough facts to get to a jury on that

22  issue of a bad faith denial here because we have multiple

23  denials.  He comes back and says tell me what's

24  classified.  I will take it out.  They say you can't

25  publish any of it other than a couple of footnotes and

1    harmless anecdotes.

2              You can open this book to any page in the

3    book and you can't find anything that's remotely

4    classified.  This is a book that is --

5              THE COURT:  How would I know that?  How would

6    I know what's classified and what's not?  How would the

7    jury know that?

8              MR. MILLS:  The -- the jury -- you know --

9    I'll give you an -- I'll give you an example.

10             THE COURT:  If you would answer my question

11   it would be very helpful.  How would the jury know what's

12   classified or what's not?

13             MR. MILLS:  Because it's obvious from the

14   context of the book.  He's talking about an excursion he

15   has to a bar in Bangkok with a friend of his.  There's

16   nothing remotely classified about it.  He talks about

17   a --

18             THE COURT:  I understand what you just said,

19   but as a judge who has had cases involving classified

20   information, I'm sure you realize that there is the issue

21   of classified documents.  And then there's also the issue

22   of revealing means and methods of intelligence gathering.

23   Are you familiar with that doctrine as well?

24             MR. MILLS:  I am, Your Honor.

25             THE COURT:  So, would you agree that a covert

1  agent who has contacts with an operative in a foreign

2  country revealing his or her identity and the identity of

3  others that they're interacting with in a covert

4  intelligence gathering operation might expose that

5  individual's family, not the agent, but the person that

6  they're dealing with to some personal risk?  Would you

7  agree with that?

8          MR. MILLS:  I think in the right context, I

9  do, Your Honor.

10          THE COURT:  Well, let me do this.  I think I

11  understand your position.

12          If -- your argument is that, one, that the

13  Agency breached the agreement by not approving the book,

14  correct?

15          MR. MILLS:  Correct.

16          THE COURT:  All right.  I think I understand

17  your position.

18          MR. MILLS:  I'd like to make just a couple

19  more quick points.

20          THE COURT:  If you would just sum up, it

21  would be very helpful to me.

22          MR. MILLS:  Yes.  This isn't the first in

23  this line of cases.  In the *Snepp* and *Marchetti* cases,

24  both of which were brought in this court and both of

25  which involved factual scenarios where the agents didn't

1    even bring it to the prepublication review board, they

2    were allowed discovery to present their defenses.

3              And in fact, in *Snepp*, not only were they

4    allowed what the Court characterized as extensive

5    discovery, we had live testimony from Stansfield Turner

6    and Richard Colby, the current and former CIA director in

7    that case on facts not nearly as egregious as you have

8    here.

9              So the Government is asking you to do

10   something that has never been done before.  We are

11   entitled to discovery to assert a defense recognized

12   under Virginia law.

13             Second, the Government hasn't met their

14   burden.  All they have done -- they have submitted an

15   affidavit from a woman named Mary Ellen Cole.  She's not

16   tendered as an expert.  She's not been qualified as an

17   expert for anything.  All she has done is assert

18   nonexpert opinion testimony and speculation and basically

19   crib quotes from the *Snepp* case as a basis for showing

20   irreparable harm.

21             If the Government is going to establish

22   liability and it has to do by clear and convincing

23   evidence here, it has to put on at least some admissible

24   evidence.

25             And the Mary Ellen Cole affidavit is not even

1  admissible, Your Honor.  It is nothing but nonexpert

2  speculation, and it's not admissible.  We're entitled to

3  discovery, to assert our defense.

4          The Government breached first.  This is an

5  egregious case where they repeatedly denied him.  They

6  sat on this appeal for six months during an election

7  year.  And he made a gutsy call and took a risk to

8  publish this on the basis that he knew there was nothing

9  classified in it, Your Honor.

10          THE COURT:  Thank you.

11          Anything further?

12          MS. BERMAN:  Yes, Your Honor.  Excuse me,

13  just a few points in summary.

14          There are no material facts in dispute here

15  on which to conduct discovery.  The -- Mr. Jones is not

16  entitled to discovery unless there are any material facts

17  on which he would be conducting them.

18          The harm in this case is self evident.  And

19  the Cole declaration is perfectly admissible, and she is

20  perfectly competent to testify in the matters that she

21  testified.

22          Your Honor, Mr. Jones' counsel referred to

23  Mr. Jones taking a risk -- assuming the risk by

24  publishing his book.  Well, respectfully, the risk is to

25  the Government, and the Government's -- and to the

1   release of classified sensitive information.  That's what

2   he took.  And he should not be able to execute -- to put

3   that risk to the Government without any consequences.

4                  THE COURT:  Thank you.

5                  MS. BERMAN:  Thank you, Your Honor.

6                  THE COURT:  Let the record reflect this

7   matter is before the Court on the defendant's motion for

8   partial summary judgment as to liability.  And this is a

9   case as we've heard involving the publication of a

10  manuscript that was not approved by the Agency in

11  prepublication review as required by the secrecy

12  agreement.

13           So the issue is whether the Court should

14  grant the Government's motion for summary judgment as to

15  liability where the plaintiff signed a secrecy agreement

16  which is attached to the complaint as Government Exhibit

17  A.

18           And, the Agency required under the secrecy

19  agreement that the plaintiff obtain written permission

20  from the Central Intelligence Agency's publication review

21  board prior to publishing any work.  And the plaintiff

22  did not secure Agency approval prior to having his book

23  published.

24           The facts are not in dispute, it seems to me.

25  Plaintiff admits that he was signatory to the secrecy

1   agreement.  He did prepare a manuscript which he

2   submitted to the publication review board multiple times,

3   and he was given feedback from the Agency about what was

4   publishable and what was not.

5           His opinion is that the Agency's refusal to

6   approve publication of his book was unreasonable and

7   deprived him of his rights under the First Amendment, and

8   he decided to publish the book without securing Agency

9   approval.

10          I don't think that this is really a very

11  difficult question.  I think the *Snepp* case would control

12  here.  It seems to me that where he signed a binding

13  secrecy agreement that prevented from publishing any

14  materials prior to receiving written consent, that under

15  *Snepp* this liability for the Government has been

16  established.

17          His signing a secrecy agreement does not

18  violate his First Amendment rights.  And his claim that

19  the Court should deny summary judgment because of genuine

20  issue of fact about whether the plaintiff's counterclaim

21  alleging First Amendment violations creates a genuine

22  issue of fact for trial.

23          It seems to me that the judgment that he

24  exercised at some risk, according to his own counsel, to

25  publish a matter without securing Agency approval does

1  not demonstrate that the Government breached the contract

2  first because plaintiff acknowledges that under the

3  process in effect that once the prepublication board

4  denied his request for publication, that he had a remedy

5  and that remedy was to come to U.S. District Court and to

6  pursue a claim to have the Court determine if the

7  Agency's withholding of permission was unreasonable.

8       Not having exercised that right, I do not see

9  how the Government could be held liable for breach when

10 they were pursuing the process as set forth in the

11 agreement.

12      So, I am first of all holding that the *Snepp*

13 case controls here.  They're both -- *Snepp* was an agent

14 and so is this plaintiff.  They both signed secrecy

15 agreements.  They both failed to adhere to them knowing

16 what they were -- the agreement said.

17      I don't think any discovery is necessary

18 because the plaintiff admits that he published without

19 the permission.

20      And the issue of whether the Government

21 breached first because of some sham appellate review, the

22 process was never over.  And, his judgment to go forward

23 without the completing -- pursuing his remedies before

24 the court was the breach.  It was not the Government's

25 breach.  The Government was carrying out it's agreement.

1    So, for those reasons, it is the -- the case

2  is also very similar to *Marchetti*, but I don't think we

3  needs to go as far as *Marchetti*.  I think that *Snepp* is

4  sufficient.

5    Motion for summary judgment for the

6  Government is granted, and the case will be dismissed as

7  it relates to his claim, counterclaim.  So, partial

8  summary judgment liability is granted.

9    What remains to be done is the issue of what

10  remedy the Government is entitled to because of the

11  breach of secrecy agreement.

12    Thank you.  You all are excused.

13    (Proceeding concluded at 10:24 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

# CERTIFICATE OF REPORTER

I, Renecia Wilson, an official court reporter for the United State District Court of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had upon the motions in the case of United States of America vs. Ishmael Jones, a pen name.

I further certify that I was authorized and did report by stenotype the proceedings and evidence in said motions, and that the foregoing pages, numbered 1 to 21, inclusive, constitute the official transcript of said proceedings as taken from my shorthand notes.

IN WITNESS WHEREOF, I have hereto subscribed my name this 29th day of June, 2011.

/s/

Renecia Wilson, RMR, CRR
Official Court Reporter

RENECIA A. SMITH-WILSON, RMR, CRR