# UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| HORACE B. EDWARDS, and<br>JOHN and JANE DOES 1-10,<br>Plaintiffs,<br><br>v.<br><br>EDWARD JOSEPH SNOWDEN,<br>PRAXIS FILMS, INC., LAURA POITRAS,<br>PARTICIPANT MEDIA, LLC, DIANE<br>WEYERMANN, JEFFREY SKOLL,<br>THE WEINSTEIN COMPANY LLC a/k/a<br>RADIUS-TWC, HOME BOX OFFICE, INC.,<br>SHEILA NEVINS, IN HER CORPORATE<br>CAPACITY, THE ACADEMY OF MOTION<br>PICTURE ARTS AND SCIENCES,<br>JOHN and JANE DOES 1-10,<br>Defendants. | Case No. 2:14-CV-02631-JAR-TJJ<br><br><br><br><br><br><br><br><br><br>SECOND AMENDED<br>COMPLAINT |

## INTRODUCTION

1.      Plaintiff HORACE B. EDWARDS hereby complains of defendant EDWARD JOSEPH SNOWDEN ("Snowden"), PRAXIS FILMS, INC. ("Praxis"), LAURA POITRAS ("Poitras"), PARTICIPANT MEDIA, LLC ("Participant"), DIANE WEYERMANN ("Weyermann"), JEFFREY SKOLL ("Skoll"), THE WEINSTEIN COMPANY LLC a/k/a RADIUS-TWC ("Weinstein"), HOME BOX OFFICE, INC. ("HBO"), SHEILA NEVINS ("Nevins"), THE ACADEMY OF MOTION PICTURE ARTS AND SCIENCES ("Academy"), and JOHN and JANE DOES ("Does"), as follows:

## EVIDENCE OF PUBLIC DISCLOSURE IS NEVER BY ITSELF A PERMISSIBLE MEANS OF DECLASSIFICATION OF CLASSIFIED NATIONAL SECURITY INFORMATION, NO MATTER HOW WIDESPREAD

2.      No governmental interest is more compelling than the security of the Nation.  This is not a "leak case" about typical government inefficiencies.  It is about the classified information

contained in *CITIZENFOUR* that goes too far and discloses for any viewer' consumption, serious national security information stolen by Snowden and used by Poitras and others for commercial gain, when the filmmakers and distributors knew the illegality of the acquisition of the records and participated in the gathering and knowing misuse thereof.  They are not innocent receivers of information who don't know where the information came from, but they acted in concert to acquire or drive a market for consumption of the information based on illegal acquisition.

3.     Classified information held by CIA officials is not determined to be declassified merely because it has been placed in the public domain by the wrongdoers.  The standards applicable to when and how classified information is properly disclosed by a former CIA employee is well-known and detailed in Executive Order 13526, Exhibit 4.  Snowden stole highly classified information and through the active, unlawful participation of filmmaker defendants who unlawfully published the information, those same defendants are now seeking to claim their actions are a permissible method of declassification.  In addition to Executive Order, this Circuit, as well as others, and the United States Supreme Court have spoken on the standards applicable to the proper declassification of United States government information.  Included in that binding precedent is the seminal case of *Wilson v. CIA*, 586 F.3d 171 (2nd Cir. 2009).  The Second Circuit held a CIA agent "is obligated by a Secrecy Agreement with the CIA not to disclose classified information…thus neither [the agent] nor the publisher of her memoir can assert a First Amendment right to publish that information."  *Wilson,* supra at 196.  Sealing classified information is the norm, unless the agency declassifies it or a court declassifies it after *in camera* inspection.

4.      It is an indisputable fact that Edward Snowden stole highly classified national security secrets and misused them in a myriad of ways, including colluding with these defendants

to make and distribute a movie that reveals classified information to the detriment of our country.

5.      Like the computer spidering and intentional, concerted actions of Snowden to admittedly plot to download a collection of hundreds of thousands or more of classified digital records belonging to those agencies of our government charged with protecting our national security and to unlawfully disseminate that classified information without any valid First Amendment shield to the other defendants who, as his participating agents, knew its disclosure was illegal, this action is and has been evolving, thus calling for amendment to reflect the complex legal and factual circumstances since the initial complaint seeking a constructive trust.

6.      Specifically, this suit involves the film *CITIZENFOUR* about Edward Snowden, a fugitive senior intelligence official, e.g. CIA/NSA/DIA, who together with the other defendants, intentionally violates obligations owed to the American people, misuses purloined classified information by disclosing it with deliberate indifference in a manner resulting in foreign enemies having obtained it.  The unauthorized possession and use of the stolen classified information by Snowden, as principal, and Poitras, in effect his agent, strategizing with the other defendants on camera contribute to aiding and abetting a fugitive, while the film itself creates a substantial and obvious risk of serious bodily injury to plaintiff and others under the Antiterrorism Act of 1990, 18 § 2331, *et seq.* ("ATA") by its effect in pointing the way for others to commit violent acts, such as those who purchase a gun or point out a victim or lure a victim into a vulnerable place, all while knowing that that's what a "hitman" was intent on doing.

7.      Defendants have created a substantial and obvious risk of serious bodily and economic injury to plaintiff and others, while defendants deny any responsibility for their joint strategizing to make use of the stolen property.

8.      This is a straightforward lawsuit in which insurance fraud about bad title to the

contents of the film is accompanied by unlawful acts of the fugitive provider of the information and collusive unlawful publication and exhibition of that information.  The claims demonstrate harm to plaintiff who has standing to bring them.  The plaintiff properly raises concerns for his own lifelong responsibilities of maintaining secrecy, having had access to classified information, which include justiciable concerns about the harm defendants have caused by *CITIZENFOUR* in the district in which he lives and in which he has long chosen to make his livelihood.

9.      This suit arises out of wrongful conduct by Snowden, as well as direct and indirect, but intentional unlawful acts by principals, their agents, aiders and abettors, co-conspirators and accessories after the fact, who committed civil law violations and criminal acts against plaintiff, the United States and the state of Kansas.  These acts include, upon information and belief, the intertwining of covert insurance fraud with numerous tortious acts, resulting in the actual, substantial increased risk of serious bodily injury to plaintiff and others, the purpose of which is the unlawful attempt to influence government national security policy and affect the operation of the United States government's national security program by intimidation and coercion.  As a consequence of their conduct, the defendants who participated in Snowden's conduct do not and cannot assert a First Amendment right to use unlawfully acquired information.  This is not a "leak case" but a case in which defendants were knowing participants and have unclean hands.  Plaintiff and others, however, are not without recourse to address this improper conduct where a remedy is provided, among other things, under the ATA, pursuant to which plaintiff has express statutory standing and venue to address direct injury.  Recourse is also available pursuant to declaratory relief, other federal and state statutory remedies, including the equitable remedy of constructive trust, to redress unjust enrichment by ensuring that ill-gotten gains are disgorged.

## PARTIES

10.     Plaintiff Horace B. Edwards is and was at all times relevant hereto a United States citizen residing in Kansas.  He is a "national of the United States" as defined in 18 U.S.C. §2331(2). At all times relevant hereto, plaintiff has been and continues to be harmed and injured in his person, property and/or business by reason of defendants' actions in Kansas as set forth herein.  He sues in both his individual capacity for harm defendants caused him personally and as a representative of other similarly situated plaintiffs.

11.     Upon information and belief defendant Snowden is a United States citizen who at all times relevant hereto was and is a fugitive from justice having been charged on June 14, 2013 with three (3) criminal counts in the United States District Court, Eastern District of Virginia. Snowden is presently residing in Russia.  Snowden is sued in his individual capacity and in his capacity as a former government official/employee and/or contractor, who violated his secrecy agreements as a principal and thereby breached his fiduciary duties to the United States and the American people through the knowing assistance of his agents Poitras, Weyermann, Skoll, Weinstein and other defendants.

12.     Upon information and belief at all times relevant hereto defendant Poitras is a United States citizen who maintains a residence in New York, NY, and lives in Berlin, Germany. Poitras is sued in both her individual capacity and in her corporate capacity as a stakeholder in defendant Praxis.  She is sued for her part in the receipt of stolen national security information, unauthorized possession thereof, for causing a substantial increased risk of bodily injury to plaintiff and others by her wrongful acts pursuant to the ATA, for aiding and abetting in the breach of fiduciary duties owed by Snowden to plaintiff and others, as a principal offender under the ATA,

a co-conspirator under the ATA and for a violator of various other federal and state law claims, as may be determined through discovery.

13.     Upon information and belief defendant Praxis is a New York domestic business corporation, which at all times relevant to the issues in this case was engaged in business relationships with Poitras, as well as other defendants herein.  Praxis is sued in its corporate capacity for the alleged wrongful acts of its employee/agents and as employer of Poitras for her alleged wrongdoings under, *inter alia*, the theory of respondeat superior.

14.      Upon information and belief defendant Participant is a Delaware domestic LLC, with its principal place of business in California as well as an office in New York, NY.  Upon information and belief at all times relevant to the issues in this case Participant was also engaged in business relationships with other defendants herein.  Participant is sued in its limited liability company capacity for the wrongful acts of its members, employees and agents and is sued as employer of Weyermann and Skoll for their alleged wrongdoings under the theory of, *inter alia*, respondeat superior.

15.     Upon information and belief defendant Weyermann is a United States citizen who resides in California and/or Florida.  Upon information and belief at all times relevant to the issues in this case she was an executive producer with substantial oversight of *CITIZENFOUR* and exerted extensive *ultra vires* control over the making of the film, including through her long-standing acknowledged personal and professional relationship with Poitras, Snowden's agent.  Weyermann is sued in both her individual capacity and in her limited liability company capacity as an executive team member, employee and/or stakeholder in Participant.

16.      Upon information and belief defendant Skoll is either a Canadian or United States citizen who resides in California.  Upon information and belief at all times relevant to the issues

in this case he was an executive producer of *CITIZENFOUR*, as well as the majority owner of the limited liability company, Participant.  Skoll is sued in both his individual capacity and in his limited liability company capacity as founder, chairman, employee, member and/or stakeholder of Participant.

17.     Upon information and belief defendant Weinstein is a Delaware domestic LLC, with its principal place of business in California as well as an office in New York, NY, which at all times relevant to the issues in this case, is and was a distributor of the film, as well as engaged in business relationships with other defendants herein.  Weinstein is sued in its limited liability capacity, although believed to be acting through a division known as Radius-TWC.

18.     Upon information and belief defendant Home Box Office, Inc. (HBO) is a Delaware domestic corporation and a wholly owned subsidiary of Time Warner Inc. with its principal place of business in New York, NY as well as an office in Santa Monica, CA, which at all times relevant to the issues in this case, is, was or will be a distributor of the film, as well as engaged in business relationships with other defendants herein.  HBO is sued in its corporate capacity.

19.     Upon information and belief defendant Nevins is the President, HBO Documentary Films for HBO, with her principal place of business in New York, NY, who at all times relevant to the issues in this case, is and was an Executive Producer of *CITIZENFOUR,* as well as engaged in business relationships with other defendants herein.  Nevins is sued in her corporate capacity as an employee/officer/agent of HBO.

20.     Upon information and belief defendant the Academy of Motion Picture Arts and Sciences (Academy) is a California domestic corporation with its principal place of business in Beverly Hills, CA.  It is sued in its corporate capacity.

21.     Upon information and belief other foreign and domestic entities and individuals may be involved and may be added as additional information is obtained through discovery.  (The John and Jane Does.)

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this matter and over defendants pursuant to 18 U.S.C. §§ 2333 and 2334 and the rules of supplemental jurisdiction, which authorizes, *inter alia,* a private damages action in any appropriate District Court by a United States national who is injured "in his person, property or business by reason of an act of international terrorism."  Plaintiff has been so injured, as more fully set forth herein, in the state of Kansas.

23.     Exclusive Federal jurisdiction in district courts is conferred herein under 18 U.S.C. § 2338, which provides "[t]he district courts of the United States shall have exclusive jurisdiction over an action brought under this chapter."

24.     Jurisdiction is also conferred by 18 U.S.C. § 2339(b) which provides, "[a] violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law."  An underlying offense has been committed in Kansas, including but not limited to "acts of terrorism transcending national boundaries" through circumstances as set forth in 18 U.S. C. § 2332b(b)(1)(A)(B) and/or (D).

25.     Furthermore, jurisdiction is proper under 28 U.S.C. §1331 because a federal question of law is alleged herein under the Antiterrorism Act of 1990, as amended, 18 U.S.C. § 2331 *et seq.,* and under federal common law pursuant to Supreme Court doctrine in *Snepp v. U.S., infra.*

26.     The District of Kansas is the proper venue for this action pursuant to 18 U.S.C. § 2334(a), as the plaintiff resides in Kansas.

27.     Additionally, defendants have purposely availed themselves of the privilege of conducting business within this State and this district through distribution of the film at issue herein as well as committing illegal, wrongful, tortious acts causing harm to plaintiff herein.

28.     Plaintiff is informed and believes and on that basis alleges that personal jurisdiction in the district is proper because each defendant participated in the unlawful distribution of the film in every jurisdiction in the United States, including this one.  In addition, each defendant has directed wrongful acts at plaintiff in this District and has committed tortious acts that each defendant knew or should have known would cause injury to plaintiff in this District.

29.     In the alternative, venue is proper in this District pursuant to 28 U.S.C. § 1391 (b)(2).

30.     Plaintiff also seeks a determination of the rights, obligations, liabilities and remedies under the Declaratory Judgment Act, 28 U.S.C. § 2201 associated with the further release and distribution of the film *CITIZENFOUR* given its use of improperly acquired and used classified information, the potential improper acquisition of E&O insurance coverage thus triggering the film's distribution under false pretenses of clear title and insular insurance protections, which are likely instead to be void ab initio, thus resulting in significant exposure to harm to plaintiff and others.

### FACTUAL BASIS FOR CLAIMS

31.     Because the film *CITIZENFOUR* contains, upon information and belief, stolen classified information it should not be shown during the Awards ceremony on February 22, 2015 or on HBO the following day and should be withdrawn from exhibition until it is reedited and redacted of classified information, which is the typical remedy utilized for unlawfully used intellectual property, i.e. copyrights, trademark and piracy violations.  Plaintiff seeks equitable

relief by separate motion to stop the irreparable injury.  Therefore, the Academy is sued in its corporate capacity because it has been on inquiry notice of the allegations raised herein through prior correspondence to the Academy, including but not limited to the letter of January 4, 2015, attached hereto as Exhibit 1.

32.    The critical facts are indisputable.  Very serious injury to our national security is attributable to Snowden's intentional public disclosure of national security intelligence, including without limitation, the highest level of information, Tier 3, and other defendants' intentional and knowing acceptance of such Tier 3 and other levels of classified information. Exhibit 2.  While some of his revelations about intercepting communications of American citizens are important and noteworthy, the fact is Snowden went far beyond those revelations and revealed and disclosed specific purloined classified information to the other defendants, who knowingly accepted such specific purloined classified information, for the express purpose those other defendants would thereafter publish that purloined classified information in the aforementioned film, and otherwise disclose in other arenas, including to as wide a global audience as possible.  Said revelations and disclosures constitute an act dangerous to human life, causing harm to plaintiff and others by exposing them to an increased substantial risk of serious bodily injury.

33.    For example, according to former General Counsel to the National Security Agency, Stewart A. Baker, "Snowden's revelations about NSA's capabilities were followed quickly by a burst of new, robust encryption tools from al-Qaeda and its affiliates…" Exhibit 3.1 (Certificate of Acknowledgement of Stewart A. Baker).  Mr. Baker's comments are based on research by RecordedFuture, a web intelligence firm, whose two reports, attached, quantify the effects on terrorist organization's improvements in their encryption systems in the few months after Snowden's June 2013 classified information releases.  The May 8, 2014 (Part 1) report found:

"Following the June 2013 Edward Snowden leaks we observe an increased pace of innovation, specifically new competing jihadist platforms and three (3) major new encryption tools from three (3) different organizations—GIMF, Al-Fajr Technical Committee, and ISIS—within a three to five-month time frame of the leaks."  Baker Exhibit 3.2, page 2.  The take-away from these two reports attached to Mr. Baker's article from WashingtonPost.com, Baker Exhibits 3.2. and 3.3, is Snowden's and defendant Poitras's, among others, illicit disclosures of classified information have resulted in increased substantial risk of serious bodily and proprietary harm to the United States and its allies, including without limitation the plaintiff, because the United States and its allies are finding it much more difficult to intercept various al-Qaeda terrorist splinter groups' communications.  This difficulty has been exacerbated by Snowden's criminal disclosures through Poitras and her own unlawful disclosures devoid of First Amendment or public interest justifications.  These groups have become more sophisticated in their encryption programs as a direct result of the acts of Snowden and his aider/abettor defendants herein and therefore able to evade detection.  Plaintiff has been harmed thereby in his person, property and business interests by the substantial increase in risk caused by these breaches and the causal chains that result in tangible harm from such increased risk.

34.    The device, means or artifice used to accomplish these improper and illegal goals is, under the circumstances of this case, activist filmmaking, seeking to reframe the actions of Snowden who is a "principal" under the ATA and attempting to transform Snowden and his co-conspirators, aiders and abettors, and accessories after the fact under the ATA into supposed heroic, patriotic "whistleblowers," while they are in fact profiteering from a national security breach.  Freedom of the press does not immunize purported journalists who commit crimes and courts recognize that such restrictions are not impermissible prior restraints or interference with

protected First Amendment content.

35.     By dissolving the layers of gloss defendants have been using to varnish and re-varnish the Snowden "hero-mystique" through *CITIZENFOUR* and otherwise, the defendants have purposely created, distributed and intend to release globally in a matter of days through HBO cable distribution, a film that goes so far afield of proper conduct as to depict, *inter alia,* the filmmaker harboring and concealing Snowden as he commits acts of terrorism as defined by the ATA.  These acts transcend national boundaries by influencing the policy of the United States government through intimidation or coercion, as defined in 18 U.S.C. § 2339.

36.     Plaintiff alleges, based upon information and belief, that Poitras, Praxis, Weyermann, Skoll and Participant have played a pivotal role in perpetrating the harms Snowden initiated, because they not only knew, but also acted intentionally to violate the ATA and other federal laws by their direct participation in his crimes and knowing disclosure of unlawfully acquired secrets, unlawful receipt of those secrets, and unlawful disclosure of those secrets, not as purported journalists, but as zealous agents lacking any legitimate First Amendment rights, public interest or privileges.

37.     In addition, Weinstein, HBO, Nevins and the Academy have willingly and knowingly become either co-conspirators and/or aiders and abettors, and/or accessories after the fact by their actions in supporting ATA violations through their distribution and/or announced intentions to show all or part of the film *CITIZENFOUR* during the Academy Awards on February 22, 2015 and thereafter on HBO on or about February 23, 2015.

38.     Each defendant named herein knows or is on inquiry notice that the film contains purloined government classified information, not properly authorized for release to the public, for which clear title does not and upon information and belief cannot vest in any of the defendants and

yet they knowingly defy various federal and state laws prohibiting the possession and misuse of classified stolen property by exhibiting the film publicly, thereby violating 18 U.S.C. § 793(d) and 18 U.S.C. §798(a)(3).  This wrongful conduct should not be condoned and plaintiff seeks by separate motion a temporary restraining order, a preliminary injunction and a permanent injunction, as well as a declaratory judgment pursuant to 28 U.S.C. 2201 to curtail the harm.

## UNDERLYING INSURANCE FRAUD FACTS

39.    Based on information and belief, a national insurance company issued E&O insurance for the film despite the film's inclusion of purloined classified information, the theft of which was admitted on screen by various individuals, including defendants Snowden and Poitras.

40.    The issuance of E&O insurance under these circumstances presents a moral hazard, insuring wrongful conduct/content, which should result in the insurance being void ab initio for alleged insurance fraud.  The use of stolen information in this particular commercial film should be obvious even upon a cursory review, given Snowden's notoriety, especially to insurance professionals who are in the business of assessing risk.  It is well-known in the industry, film underwriters typically require clearance opinions from outside counsel for the proposed insured, assuring the carrier of such things as clear title to content, releases from individuals depicted in the film, title clearance, as well as music rights clearance, before undertaking to quote rates and issue coverage.  Documentaries are especially prone to clearance issues because the subjects typically aren't actors with talent agencies working under standard contracts and thus a clearance opinion letter from counsel well-versed in the vetting of documentary films and familiar with the law applicable thereto is a high priority both from the initial insurance carrier's perspective, but in many instances is even more important to the reinsurance carriers who accept portions of the risk from the ceding company based on such clearance letters having been acquired.  The business of

13

E&O insurance has always walked a fine line between underwriting intentional versus negligent conduct, one type of conduct which is insurable, the other type which is not because it is void as against public policy.  In this case, the balance tips against the defendants whose knowing and willful conduct using purloined material in the film is undeniable.

41.     The fact is "but for" the underlying insurance fraud, given the nature of E&O insurance and the insurance industry's requirements to avoid the moral hazards of insuring illegal content, it is common sense that E&O carriers require film and entertainment businesses to assure the carrier that the filmmakers, producers and distributors have clear title to content, otherwise, as is the case herein.  The downstream businesses and others, such as the theaters, are exposed to risks of unknown proportion, i.e. potential liability for activities that involve acts dangerous to human life.  The American public, the plaintiff and others should not be made to suffer harms as unwitting consumers due to such improper conduct.  The Court is asked to fashion a remedy to inoculate the public from exposure to classified information for which unauthorized viewing could result in criminal and civil enforcement actions under, for example, Executive Order 13526. Exhibit 4, and *"The Protection of Classified Information: The Legal Framework,"* Exhibit 5.

42.     A clear warning letter about improper title, stolen national intelligence information, and insurance concerns was sent to the Academy.  Exhibit 1.

43.     The serious harm attendant to void E&O insurance includes the increased substantial risk of uncovered loss to the American public and to plaintiff, who are thereby deprived of the availability of Terrorism Risk Insurance Program coverage pursuant to 15 U.S.C. § 6701, Sec. 101 *et seq.*  The quantifiable resulting harm is the loss of up to $100 Billion Dollars in mandatory coverage, because of the moral hazard, i.e. the insurance fraud in the application or issuance process results in voiding of what would otherwise be mandatory coverage required by

14

federal statue for all commercial insurance policies. The unavailability in this instance is especially harmful given the asserted increased risk of terrorist acts causing serious bodily injury triggered by the wrongful acts of defendants, including among other things, Snowden's release of highly-sensitive, classified Tier 3 information to our enemies. Exhibit 2.

44.     The conduct of the defendants raises issues not only addressable by disgorgement but also places their conduct within the express provisions of the ATA in conjunction with the underlying claim of insurance fraud. The procurement of E&O coverage is a necessary requirement for *CITIZENFOUR* to be exhibited in theaters, to be eligible for nomination by the Academy and/or exhibited, distributed, broadcast or shown globally during the Academy Awards and thereafter by defendant HBO. The activities of the defendants herein, originating with Snowden, have resulted in legally analogous substantially increased risk of serious bodily injury to the American Public, here and abroad, as well as injury to the property of United States businesses, including to plaintiff's person, business and personal property interests.

## FACTS APPLICABLE TO ATA VIOLATIONS AND INTENTIONAL MISCONDUCT

45.     The on-film admissions against interest of Poitras, who, upon information and belief, misrepresents herself to be a journalist but instead, is a central character and actual participant in a scheme to profit from stolen United States government property demonstrate intent. For example, Poitras speaks in first person narrative about her role in aiding and abetting defendant Snowden, hiding him in her hotel room while he changes into disguise, accepting all of the purloined information to use for her personal benefit, financially and professionally, filming defendant Snowden's meeting with a lawyer in Hong Kong as he tries to seek asylum, and in various interviews since June 2013 contending she has the legal right to possess and control stolen classified digital information belonging to the United States government and to parlay that

15

information into profit for herself and certain other defendants.

46.     The actions of other defendants amount to co-conspiracy or accessories after the fact under the ATA.  Poitras and Praxis eventually partnered with defendants Weyermann, Skoll, Participant, and Weinstein to take the original film footage of Snowden's Hong Kong admissions and cloak Snowden's illegal acts in the guise of righteousness and virtue, thereafter portraying Snowden as a well-meaning whistleblower having nowhere else to turn, while the defendants overlook their own improper acts of misusing government property.  In fact, *CITIZENFOUR* glorifies hacking that results in "[t]he potential of global events to instantaneously spark grievances around the world [and] hinders advance warning, disruption, and attribution of plots through "Homeland Plotting" and "Terrorist Activities Overseas."  Exhibit 6 (James R. Clapper, Director of National Intelligence, excerpt from "Statement for the Record Worldwide Threat Assessment of the US Intelligence Community," Senate Select Committee on Intelligence, January 29, 2014.)

47.     Together these defendants have concertedly acted without regard for the health, safety and welfare of all United States Citizens, have aided and abetted the illegal and morally wrongful acts of Snowden, and have chosen to commercialize, capitalize and commoditize for their personal benefit, the stolen classified CIA/NSA/DIA and other secret records referred to and revealed in the film.

48.     The national security of the United States has been severely damaged, human lives placed at risk of serious injury or death, and military and non-military economic assets compromised, by Snowden's and other defendants actions, direct and indirect collusion with Snowden to facilitate the dissemination of classified national security documents to the global community.

49.     On or about June 14, 2013, the United States of America filed a criminal complaint,

initially under seal, against Snowden related to the conduct described herein.  The criminal complaint alleged Snowden had violated the law by "Theft of Government Property," "Unauthorized Communication of National Defense Information," and "Willful Communication of Classified Communications Intelligence Information to an Unauthorized Person."  Exhibit 7.  The charging of these federal felonies are not simply allegations by the plaintiff but go to the requirements of 18 U.S.C. § 2332b(a)(1)(B).  By charging a criminal complaint federal prosecutors have determined, pursuant to Department of Justice policy, that there is sufficient evidence to sustain a conviction.[1]

50.     Upon information and belief the factual basis for the claims against Snowden and the defendants are set forth in the following: the film *PRISM,* a short documentary precursor of *CITIZENFOUR,* Exhibit 8 [2] and in the attached articles by professional journalists, who interviewed Snowden, Poitras, and others and reported on the admissions, statements and other disclosures and conduct by Snowden and certain other defendants. Exhibits 2, 9, 10.

51.     Based upon their own filmed admissions, Snowden traveled to Hong Kong, where he met Poitras, having previously arranged to meet her there, and provided her with the purloined materials." Exhibit 2 at 1, 4; Exhibit 10 at 1, 2.

52.     Poitras exchanged emails with Snowden before traveling to Hong Kong, to meet with him and to film him, including the filming of the process of Snowden's divulging the purloined classified information to Poitras and others.  Exhibit 9 at 3; Exhibit 8.

---

[1] Principles of Federal Prosecution, United States Attorneys Manual, 9-27.220, Grounds for Commencing or Declining Prosecution.
        A. The attorney for the government should commence or recommend Federal prosecution if he/she believes that the person's conduct constitutes a Federal offense and that the admissible evidence will probably be sufficient to obtain and sustain a conviction, unless in his/her judgment, prosecution should be declined because: 1. No substantial Federal interest would be served by prosecution; 2. The person is subject to effective prosecution in another jurisdiction; or 3. There exists an adequate non-criminal alternative to prosecution.

[2] Defendant Academy has acknowledged that at least 2 minutes of *PRISM* are used in *CITIZENFOUR.* This Court when it determines the relief that should be fashioned from any unlawful disclosures contained in earlier versions of *CITIZENFOUR,* as well as the outtakes sought in expedited discovery for *in camera* review, can address the issue of any classified information contained therein.

53.     Upon information and belief, and based upon the exhibits annexed hereto and in the film *CITIZENFOUR*, subsequently Snowden traveled to Russia as a fugitive from the United States, and Poitras traveled to Berlin, where she continued working on a commercial film in 2013 and 2014, documenting Snowden's decision process and actions to convey the purloined classified information to Poitras and others.  Exhibits 10, 9 at 4.

54.     Upon information and belief, defendant Poitras stated that she "set up a bunch of meetings during the Berlin International Film Festival in February [in 2014], including one with Tom Quinn at [defendant] Radius-TWC."  Exhibit 9 at 4.   Further upon information and belief, Poitras stated that Quinn said "We really want to do this film."  Subsequently, Radius has been credited as the Domestic Theatrical distributor of the film.  Further upon information and belief, defendant Radius-TWC provided funding to Poitras and Praxis and, in return, made a financial arrangement to receive revenues from *CITIZENFOUR*. Defendant Weinstein through Radius-TWC engaged in all the aforementioned conduct with the knowledge of the crimes committed against the United States by Snowden and with knowledge that Poitras has possession, custody and control of purloined information illegally obtained by Snowden, which Weinstein hoped to obtain financial benefit therefrom as entertainment, among other things.

55.     Upon information and belief, Poitras admitted that "Participant Media's Diane Weyermann got involved" with the financing and other tasks for *CITIZENFOUR*.  Exhibit 9 at 4.

56.     Upon information and belief, Poitras admitted that Weyermann actively sought to accelerate the production and release of *CITIZENFOUR* and Weyermann stated:  "Ok, let's do this one," but then had to tell her bosses, "We're doing this film, but there's not going to be a treatment or a rough cut.  You're just going to have to trust us—me [i.e. Weyermann], Laura and the filmmaking team that we'll deliver." Exhibit 9 at 4.  Further, upon information and belief, Poitras

also admitted that Weyermann "made a couple visits over to Berlin to see the cut." *id.*, and that

defendant Weinstein Radius-TWC also came over for the same purpose. *Id.*

57.     Upon information and belief, Weyermann worked with former CIA Officer Valerie

Plame Wilson on a documentary film entitled "Countdown to Zero," which Participant helped

finance and Weyermann served as an Executive Producer.   Further upon information and belief,

Participant and Weyermann were also involved in the production, distribution and financing of

Ms. Wilson's feature film based upon her memoir, "Fair Game."   Upon information and belief

through this professional and personal relationship with Ms. Wilson, Weyermann was aware that

Ms. Wilson, as a former CIA officer, was required to sign a secrecy agreement that would require

her and anyone to whom she disclosed classified information without authorization to disgorge

and otherwise return to the United States all financial benefits obtained from any such

unauthorized disclosure.  Exhibit 15 (Affidavit of David B. Smallman.)

58.     Further upon information and belief, Weyermann, knew that Ms. Wilson had

litigated a First Amendment claim against CIA; however, by Wilson having presented her

manuscript to the CIA's publication review board and following the rules of her secrecy

agreement, Wilson was never required to disgorge or otherwise return any money to the United

States.  Upon information and belief, Weyermann knew the consequences of not following the

prepublication rules required by government intelligence officials.  When Weyermann made the

request to Participant's management to "trust her" she knew or had reason to know both that

defendant Snowden's materials, having been stolen, were *per se* in violation of the prepublication

rules governing intelligence officials and she knew or had reason to know the material fact that

Participant's investment in the film *CITIZENFOUR* could be at risk if the issue of the secrecy

agreement approval requirement was ever recognized or raised.  Exhibit 15.

59.     Further upon information and belief, the defendants knew or should have known through Weyermann that *CITIZENFOUR* would be subject to Snowden's secrecy agreement with CIA based upon Weyermann's prior knowledge of potentially serious consequences, which she acquired through familiarity with Ms. Wilson's litigation regarding her secrecy agreement with CIA.  It follows therefore that Weyermann knew that by personally securing and ensuring the funding of *CITIZENFOUR,* thus aiding and abetting Poitras and Praxis, all of the defendants would be subject to the confiscation of funds, as well as to other potential civil damages and criminal claims arising from Weyermann's deliberate acts and omissions.

60.     Upon information and belief, Participant and Skoll had constructive or actual knowledge of the serious consequences of Weyermann's misconduct, or, in the alternative, upon information and belief, were misled by Weyermann's *ultra vires* conduct and therefore personally and professionally exposed to aiding and abetting Poitras and Praxis, to substantial monetary damages based upon their participation in such capacities in *CITIZENFOUR* and to the harm to the United States that has resulted from that film, along with all of the other defendants.

61.     Upon information and belief, Participant and Skoll, based primarily upon Weyermann's personal assurances and professional representations to her boss, Skoll, as well as others, to "trust her," knowingly and willingly chose to place themselves in the position of aiders and abettors to Poitras' and Praxis' in the chain of liability for misusing purloined and stolen property to produce the film in return for compensation agreements, when Skoll agreed with Weyermann to commit Participant to the project, and upon information and belief defendant Skoll gave the actual, final approval to provide funding therefore.

62.     Upon information and belief, like Ms. Wilson's secrecy agreement requirement, in order to qualify to obtain access to the information as an advisor and/or employee to CIA, NSA,

and DIA, as well as a contractor for the NSA, Snowden, as a condition of receiving the information

that he subsequently purloined and provided to Poitras, Praxis and disclosed to the defendants, was

required to sign written agreements with CIA, NSA, and DIA.  In those agreements he promised

not to provide any information to others, and to "assign to the United States Government all rights,

title and interest in any and all royalties, remunerations and emoluments that have resulted or will

result or may result from any divulgence, publication or revelation of information [by him] which

is carried out" in breach of those agreements. Exhibit 11 at ¶ 5, ¶ 7, and ¶12.

63.     Snowden's breach of those agreements set off a chain reaction of liability and actual

harm.  Not only are the plaintiff and the American public exposed to substantially increased risk

of harm by terrorist organizations such as al-Qaeda, as referenced above, but business interests in

the cloud computing industry have also been seriously damaged by the Snowden revelations.

United States tech companies have been estimated to have lost or will lose, over a 3 year period

beginning with the June 2013 disclosures, between $21.5 to $35 billion dollars by 2016, because

of Snowden's wrongful acts.  Exhibit 12.

## COUNT I
## (VIOLATIONS OF 18 U.S.C. § 2333)

The plaintiff incorporates all preceding paragraphs by reference, as if fully set forth herein.

64.     Defendants Snowden, Poitras and Praxis are civilly liable to the plaintiff under the

Antiterrorism Act of 1990, as amended, 18 U.S.C. § 2333 and § 2332b as principal offenders for

the injury to plaintiff in his person, property and business by reason of an act of international

terrorism due to their activities that involve violent acts or acts dangerous to human life.  They

became principals and agents of one another by engaging in a joint strategy to attempt to avoid

legal liability, and were otherwise direct participants in the unlawful acquisition and dissemination

of the information, thus depriving them of a First Amendment shield.  Their acts both in the making

of the film and in distributing to unauthorized persons classified information are violations of the criminal laws of the United States or of Kansas, or that would be criminal violations if committed within the jurisdiction of the United States or of Kansas. Their activities depicted in the film are intended to intimidate or coerce a civilian population or to influence the policy of the United States government by intimidation or coercion of its governmental authorities through misuse of stolen property given to enemies of the United States. And by severely damaging the national security intelligence infrastructure, their conduct has affected the conduct of the government by mass destruction of that digital infrastructure.

65.    Their acts in filming and editing the film occurred primarily outside the territorial jurisdiction of the United States, as well as their actual and intended global exhibition of the film transcends national boundaries in terms of the means by which their wrongful acts are accomplished. Pursuant to the statutory requirements, the defendants intended to intimidate or coerce governments, both nationally and internationally, by overt and covert references to highly classified national security information allegedly in their possession or under their control, along with asserting negative connotations from purported cooperation between and among international governments, all as contained within the purloined information. Given the locale in which these defendants and Snowden have operated or seek asylum, including Hong Kong, China and Russia, the intent to intimidate or coerce the United States and its allies also transcend national boundaries and therefore violate the terms of the ATA. 18 U.S.C. § 2331.

66.    Defendants actions as described herein with Snowden stealing classified materials from the United States government, passing them to Poitras, and sharing the classified information with our enemies, exhibited both in the film and by other means, (such as delivering data on thumb drives and providing the necessary encryption key to access the digital information,) has

substantially increased the risk of serious bodily injury to plaintiff and others.  Poitras and Praxis, using those documents without having clear right, title and interest thereto to create a film in which the plot and dialectic intends to intimidate or coerce both the American civilian population and the United States government, as well as to influence the policy of the government regarding intelligence gathering, all violate the ATA.  The film concludes with a scene in which the defendants and others insinuate knowledge and control of information damaging to the operations of the government and to the Presidency itself.

67.    Snowden's fugitive and asylum status in Russia or elsewhere outside the jurisdictional boundaries of the United States are acts transcending national boundaries and his locale in Russia, preceded by his stays in China and Hong Kong, are further evidence of the means by which he intends to intimidate or coerce the plaintiff and others to keep silent.  In addition, Snowden and certain defendants in the film send the government of the United States a not so subtle warning by insinuating, if not outright admitting, he turned over highly classified documents related to our national security to Chinese nationals for the purpose of influencing the policies of the United States government.   Exhibit 13.   Poitras's acceptance and use of the purloined documents are but a continuation of the acts dangerous to human life, all of which began on or about June 9, 2013 and continue through the present day and in to the future as repeated in each exhibition of *CITIZENFOUR.*

68.    These actions are acts dangerous to human life because the repetitious disclosure of classified information, the implicit threats to the United States government, and the revealing of locations associated with points of transfer of national intelligence at international borders gives rise to a substantial increase in the serious risk to human life, including plaintiff's life, by enemies of the United States, known to engage in international terrorism, taking advantage of such

knowledge to the detriment of our intelligence and military forces and private business interests. These actions violate both federal and state criminal laws, including but not limited to 18 U.S.C. § 641 (theft of government property); 18 U.S.C. § 793(d) (unauthorized communication of national defense information); 18 U.S.C. § 798(a)(3) (willful communication of classified communications intelligence information to an unauthorized person); 18 U.S.C. § 1030 (fraud and related computer activity in connection with computers); 18 U.S.C.§ 2520(a)-(c) (interception and use of contents of communications); K.S.A. § 21-5421 (terrorism); K.S.A. § 21-5302 (conspiracy); and K.S.A. § 21-5303 (criminal solicitation).

69.     The improper application and acquisition of E&O insurance, originating with Poitras and Praxis, upon information and belief, are also subject to violations of Kansas common law insurance fraud, constitute unlawful conversion, as well as violating K.S.A. 40-2,118. Specifically, false or untrue representations were made as a statement of existing and material fact of clear title and proper ownership of content in the film reposing in defendant Poitras and/or Praxis as, upon information and belief, were represented in the application for insurance.  These representations, upon information and belief, were known to be false or untrue by the defendant making them, or were recklessly made without knowledge concerning there falsity.

70.     In addition, upon information and belief, Poitras, Praxis, as well as other defendants, had knowledge of material facts related to qualification for coverage that were unknown to the insurer[s] that could not have been discovered by the exercise of reasonable diligence or were induced by the defendants failure to communicate material information to the insurer(s).  The acts of defendants in the application, including but not limited to representations made by defendants, agents or representatives thereof, justified reasonable reliance thereon.  The representations were intentionally made for the purpose of inducing another party to act upon them.

Upon information and belief, the insurer(s) reasonably relied and acted upon the representations made.  Damages were sustained by plaintiff including loss of terrorism risk insurance in the amount of up to $100 Billion Dollars, as well as other coverages to be determined.

71.     Upon information and belief, material facts were suppressed by defendants who were under a legal or equitable obligations to communicate and in respect of which they could not be innocently silent.  Snowden admittedly stole information and property, which was known by defendants as being such and used in the film.  Plaintiff and others sustained damages by the carrier(s) reliance upon the defendants' material representations or omissions.  Those representations or omissions were material as related to *CITIZENFOUR* and so substantial as to unduly influence those to whom they were made.  By having presented materially false information to procure insurance, knowing that the distribution of the film would include Kansas, that if such fraudulent representations were detected they would result in a void policy, thereby exposing plaintiff and all other Kansans so situated to lack of coverage for Terrorism Risk Insurance in the event of a terrorist attack, all perpetrated because of national security breaches occasioned by Snowden's, Poitras's and Praxis's actions, and therefore the defendants should be held liable for insurance fraud damages arising therefrom.

72.     The acts of Poitras are not entitled to First Amendment protection given her actual participation in the acquisition of the purloined documents, conspiring with Snowden regarding how to use the stolen documents and retaining the documents without proper authorization from appropriate governmental authorities and applying for insurance, upon information and belief, when she knew Praxis could not have good title to Snowden's stolen information.

### COUNT II
### (VIOLATIONS OF 18 U.S.C. § 2339 AND §2339A—POITRAS)

The plaintiff incorporates all preceding paragraphs by reference, as if fully set forth herein.

73.     Poitras, upon information and belief, from on or about June 6 through on or about June 22, 2013 films and releases video of Snowden in Hong Kong.  At one point in the filming, Poitras admits she has invited Snowden, at that time a known fugitive from justice in the United States, to use her hotel room for the purpose of evading authorities, changing into a disguise, and preparing to take refuge in a safe house somewhere in Hong Kong or China.  These acts amount to harboring or concealing a terrorist pursuant to 18 U.S.C. § 2339 and/or providing material support, resources, and/or a disguise as part of carrying out the concealment of an escape in violation of 18 U.S.C. § 2339A.  The provision of lodging, services, a safe house, communications equipment, and facilities, among other resources, are violations thereof.   Plaintiff has been damaged thereby and the defendant should be held liable for damages in a sum to be determined based on that increased risk of exposure.  Poitras' on camera concealment of Snowden in her hotel room as he evades authorities clearly shows Poitras providing Snowden with "material support" as defined in 18 U.S.C. § 2339A.

74.     First Amendment protections aren't available for actions in concealing and harboring a fugitive from justice and Poitras is liable under the ATA for these wrongful acts, just as any other citizen should.  Purported journalists are not cloaked in First Amendment protections for aiding and abetting a self-proclaimed thief under the ATA, and admissions of such conduct are depicted in the film.

## COUNT III
### (VIOLATIONS OF 18 U.S.C. 2333—WEYERMANN, SKOLL, PARTICIPANT, WEINSTEIN, HBO, NEVINS AND ACADEMY)

The plaintiff incorporates all preceding paragraphs by reference, as if fully set forth herein.

75.     Defendants Weyermann, Skoll, Participant, Weinstein, HBO, Nevins and Academy are civilly liable to the plaintiff under the Antiterrorism Act of 1990, as amended, 18 U.S.C. §

26

2333 and § 2332b as co-conspirators and/or accessories after the fact, having used the mail or other facilities of interstate or foreign commerce, including theaters, television and cable broadcasts, in furtherance of the offense committed by the principals, Snowden, Poitras and/or Praxis, as they are alleged to have committed violations within the definition of 18 U.S.C. § 2331 and which give rise to civil liability under 18 U.S.C. § 2333; and pursuant to 18 U.S.C. § 2332b(b)(1)(A) and/or under § 2332b(b)(1)(B) when the offense obstructs, delays, or affects interstate or foreign commerce, and/or under § 2332b(b)(1)(D) when the structure or other real or personal property is, in whole or in part, owned, possessed, or leased to the United States, or any department or agency of the United States.

76.     The theft of classified computer information related to national security [in itself a violation of 18 U.S.C. § 1030 and 18 U.S.C. §641] and these defendants knowing and intentional use of such information in the film, [separate violations under 18 U.S.C. §u793(d) and 18 U.S.C. § 798 (a)(3)] which by their use thereof these defendants have aided and abetted as co-conspirators and/or accessories after the fact of offenders Snowden, Poitras and Praxis, in addition to their own, actual dissemination through various means of interstate commerce, or announced intentions to further disseminate through various means at their disposal in interstate commerce all in violation of 18 U.S.C. § 2332b(b)(2).

77.     In the alternative, these defendants' actions may give rise to violations under 18 U.S.C. § 2332b(a)(2); however, discovery may be required to thus establish such offense and therefore plaintiff alleges this cause of action upon information and belief.

78.     Skoll acquiesced in Weyermann's actions, either as an agent of Participant or acting *ultra vires,* by permitting Weyermann to undertake production of the film without following established procedures in order to strategize improperly with Snowden and Poitras and participate

in their scheme to unlawfully possess and disseminate stolen classified information under the guise of a legitimate documentary.  His actions give rise to the plaintiff's injuries under 18 U.S.C. § 2333 and § 2332b both individually and in his LLC capacity.

79.     Participant is the entity which, upon information and belief, has released the film, and knowledge of its agents, employees, and members, i.e. Weyermann and Skoll, are imputed to the LLC, which can only act through its agents, employees and members.  Therefore, Participant's liability under the ATA attaches through the same violations as set forth above and otherwise herein.

80.     Weinstein is a distributor of the film released on October 10, 2014, and upon information and belief has contractual relationships with, among others, defendants Participant, HBO, and Praxis.  Plaintiff believes that after additional discovery is completed, the contractual relationships and other evidence will show that Weinstein knew or was upon inquiry notice through its agents' participation in either the editing or final review process in 2014, that the film contained scenes depicting classified information not authorized for release to the public, as well as scenes depicting defendant Poitras committing acts of concealment, providing material support as well as aiding Snowden, a known fugitive from justice, all in violation of 18 U.S.C. § 2332b and resulting in further liability under 18 U.S.C. § 2332b(b)(2), co-conspirators and/or accessories after the fact.

81.     HBO is a scheduled cable distributor of the film with an announced release date for the film on or about February 23, 2015 on HBO's networks, and upon information and belief has contractual relationships with, among others, defendants Participant, Weinstein, and Praxis. Plaintiff believes that after additional discovery is completed, the contractual relationships and other evidence will show that HBO knows or is now upon inquiry notice through its agent Nevins'

participation as an executive producer for the film as well as in either the editing or final review process in 2014, that the film contains scenes depicting classified information not authorized for release to the public, as well as scenes depicting defendant Poitras committing acts of concealment, providing material support as well as aiding Snowden, a known fugitive from justice, all in violation of 18 U.S.C. § 2332b and resulting in further liability under 18 U.S.C. § 2332b(b)(2), as co-conspirators and/or accessories after the fact.

82.     Nevins as executive producer of the film and as President of HBO is named herein in her corporate capacity only.  Upon information and belief Nevins is aware of or has participated in the execution of contractual relationships with, among others, defendants Participant, Weinstein, and Praxis to distribute the film to millions of cable subscribers.  Plaintiff believes that after additional discovery is completed, the contractual relationships and other evidence will show that Nevins as agent of HBO knew, knows or is now upon inquiry notice as an executive producer for the film as well as in either the editing or final review process in 2014, that the film contains scenes depicting classified information not authorized for release to the public, as well as scenes depicting defendant Poitras committing acts of concealment, providing material support as well as aiding Snowden, a known fugitive from justice, all in violation of 18 U.S.C. § 2332b and resulting in further liability under 18 U.S.C. § 2332b(b)(2), as a corporate co-conspirator and/or accessory after the fact.

83.     The Academy has been made aware of the lack of clear title to the purloined, classified content contained in the film, issues of inapplicability of E&O insurance coverage triggered by those title issues, among other things, and the fact that distributing or displaying parts of the film during the Awards show further exacerbates the harm done under the ATA by releasing to unauthorized viewers matter that is both government property and content that has not been

cleared by the appropriate authorities.  Exhibit 1.  The Academy's actions thus create increased risk of substantial bodily harm under the ATA as an aider, abettor, or accessory after the fact.

84.     Plaintiff has been subjected to an increased risk of substantial risk of serious bodily injury by the concerted actions of these defendants due to their violations as co-conspirators and/or accessories after the fact.  18 U.S.C. § 2331.

85.      Poitras and Praxis, upon information and belief are also subject to violations of Kansas common law insurance fraud as well as violation of K.S.A. 40-2,118 by having presented materially false information to procure insurance, knowing that the distribution of the film referenced herein would be shown within the borders of Kansas, that such insurance if such fraudulent representations were detected would result in a void policy, thus exposing plaintiff and all other Kansans so situated to lack of coverage for Terrorism Risk Insurance in the event of a terrorist attack perpetrated because of national security breaches occasioned by Poitras actions and Praxis's film.

## COUNT IV
## (CONSTRUCTIVE TRUST FOR BREACH OF FIDUCIARY DUTY)

The plaintiff incorporates all preceding paragraphs by reference, as if fully set forth herein.

86.     The aforementioned conduct constitutes unjust enrichment for the defendants that warrants damages to compensate the harm to the intelligence infrastructure of United States government and to deter future conduct by these defendants, as well as others similarly situated. The plaintiff asserts a constructive trust is the appropriate remedy.

87.     It was first recognized as the appropriate remedy by the Supreme Court in *Snepp v. United States*, 444 U.S. 507 (1980).  It is routinely sought and ordered in cases of breaches of CIA secrecy agreements, such as the agreements likely signed by Snowden.

88.     Such action is appropriate to end the profiteering of the defendants and deter future

government employees from breaching their fiduciary duties to the American people when they are entrusted with secret, confidential, or classified information as a condition of their hiring.[3]

89.     Plaintiff sues on behalf of the United States of America, in the nature of a private attorney general, under theories of a derivative action, as well as a third party beneficiary of the relevant agreement[s] defendant Snowden executed and other obligations he breached.

90.     In addition, plaintiff asserts a principal/agent relationship arose between Snowden and Poitras, when the two of them joined forces to "craft an appropriate strategy" in dealing with release of the classified documents, thus falling outside the purview of First Amendment protections, like the ADL did in the case of *Quigley v. Rosenthal,* 327 F.3d 1044, 1065, 1066 (10th Cir. 2003).

91.     Violating his secrecy agreement, Snowden breached his fiduciary duties owed to the plaintiff and the American people as a whole, who are the ultimate intended beneficiaries of the secrecy agreements, loyalty agreements, and fiduciary duties arising therefrom by intelligence officials, including defendant Snowden.  The defendants have exposed plaintiff and others to harm by aiding, abetting, co-conspiring and acting as accessories after the fact in that the instability caused within the United States and abroad has jeopardized all Americans safety and security. Plaintiff requests the imposition of a constructive trust upon the defendants.

---

[3] *See, e.g.* Slip Op., *United States of America v. Ishmael Jones*, Civil No. 10-765 (Hon. Gerald Bruce Lee, J.) (E.D. Va. June 15, 2011) (Motions Hearing; granting summary judgment to United States Government and imposing constructive trust against intelligence official for breaching secrecy agreement based upon *Snepp* precedent).  A copy of this Motions Hearing is attached as Exhibit 14.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court:

(a)     Enter judgment, find and declare that defendants have violated 18 U.S.C. § 2331 *et seq.,* including but not limited to 18 U.S.C. § 2333, and award against the defendants, jointly and severally, all remedies to which plaintiff is entitled to compensate for his injuries under such provisions for violations thereof;

(b)     Enter judgment on plaintiff's behalf against defendants, jointly and severally, for compensatory and punitive damages in the amount of up to $100 Billion Dollars, plus costs and attorneys' fees and request the trebling of damages and for such other relief as to the Court may deem equitable;

(c)     Declare the E&O and any other insurance for *CITIZENFOUR* is null and void ab initio based on the facts asserted herein, and further hold that any such insurance was obtained through fraud, in violation of Kansas common law, Kansas statute K.S.A. 40-2,118, and/or the law of each and every state for which the coverage applies or would have applied and that the policy(s) is or are void ab initio due to, among other things, material omissions or commissions, misrepresentations and failures to provide material information in the application and under the continuing obligations to inform the insurer(s) of material changes in circumstances; award damages to plaintiff in an amount to be determined by the Court, including damages caused by the loss of Terrorism Insurance.

(d)     Declare that defendants' actions violated both federal and state criminal laws, including but not limited to 18 U.S.C. § 641 (theft of government property); 18 U.S.C. § 793(d) (unauthorized communication of national defense information); 18 U.S.C. § 798(a)(3) (willful communication of classified communications intelligence information to an unauthorized person);

18 U.S.C. § 1030 (fraud and related computer activity in connection with computers); 18 U.S.C.§ 2520(a)-(c) (interception and use of contents of communications); K.S.A. § 21-5421 (terrorism); K.S.A. § 21-5302 (conspiracy); and K.S.A. § 21-5303 (criminal solicitation).

(e)     Declare that Poitras violated 18 U.S.C. §§ 2339 and 2339A by harboring or concealing a terrorist pursuant to 18 U.S.C. § 2339 and/or provided material support, resources and/or a disguise as part of carrying out the concealment of an escape by Snowden in violation of 18 U.S.C. § 2339A and award damages to plaintiff for injury arising therefrom.

(f)     Declare that defendants Weyermann, Skoll, Participant, Weinstein, HBO, Nevins, and the Academy are civilly liable to the plaintiff under the Antiterrorism Act of 1990, as amended, for the plaintiff's damages incurred by their actions as more fully set forth in Count III.

(g)     Declare that defendant Snowden has breached his contracts, including any secrecy agreement(s) regarding any information he agreed not to disclose, and also breached his fiduciary obligations pursuant to those agreements and Executive Order 13526;

(h)     Declare that *CITIZENFOUR* contains classified information unlawfully obtained and used by Snowden and unlawfully acquired and used by defendants, which has not been declassified and as to which neither Snowden nor other defendants had or have good title;

(i)     Declare and order defendants to reedit and redact all classified information contained in *CITIZENFOUR* and further order that the film not be exhibited in any version containing classified information in any media, including but not limited to theaters, the internet, broadcast television, cable television, satellite carriers, DVD, and video on demand, unless and until defendants redact and reedit a version granted Court approval or the approval of any agency of the United States with authority thereof, without any classified information contained therein.

(j)     Declare and order defendant Academy to withhold any award for the film

*CITIZENFOUR* in its present version which defendants have acknowledged and/or admitted contains classified information and order that the film be ineligible for any Academy Award in 2015 due to, *inter alia*, underlying insurance fraud and the need to remove stolen, classified information through reediting and redaction of the current version of the film.

(k)  Grant to the plaintiff such other relief as the Court may deem just and proper, including but not limited to, compensatory damages, punitive damages, treble damages to the extent authorized by statute, injunctive relief, equitable relief, and all plaintiffs' costs, expenses and attorney's fees herein.

Dated: February 14, 2015.

<u>**DESIGNATION OF TRIAL**</u>

Plaintiff hereby requests the trial in this case be conducted in Kansas City, Kansas.  No Jury Trial is requested.

<u>/s/ Jean Lamfers</u>
Lamfers & Associates, L.C.
Jean Lamfers # 12707
7003 Martindale
Shawnee, KS  66218
(913) 962-8200
jl@lamferslaw.com
Attorney for Plaintiff Horace B. Edwards