## LAMFERS & ASSOCIATES, L.C.
### Attorneys at Law

Jean Lamfers*

7003 Martindale Road
Shawnee, Kansas 66218
E-Mail jl@lamferslaw.com
www.lamferslaw.com

*Admitted in Missouri & Kansas

January 4, 2015

(913) 962-8200

Ms. Cheryl Boone Isaacs, President
Ms. Kate Amend
Mr. Rob Epstein                                         **Sent via Email ONLY c/o**
Mr. Alex Gibney                                         smiller@oscars.org
Documentary Branch Executive Committee                   **Please Forward to Recipients**
The Academy of Motion Picture Arts and Sciences
8949 Wilshire Boulevard
Beverly Hills, CA 90211

    Re:   Notice and Response to Mr. Miller's Email of December 22, 2014
              Additional Information for Consideration in follow-up to 12-9-14 and 12-12-14 Letters
              Eligibility Determination Request, "Citizenfour" Documentary, 87th Academy Awards

Dear Ms. Isaacs, Ms. Amend, and Messrs. Epstein and Gibney:

      I am writing one more time because it is the right thing to do under these circumstances, not because I wish to beat a dead horse. I certainly understand the Academy writes and interprets its own Rules; however, my client and I want to be sure we have done our level best and gone that extra mile to provide fair and adequate notice and disclosure of additional concerns regarding Citizenfour. I have been out of the office with both the holidays and a terrible cold, so I apologize for not getting back to you sooner.

      Attached is a courtesy copy of Mr. Horace Edwards' Complaint and Exhibits A through I, filed December 19, 2014. Given the timing of the filing and Mr. Miller's December 22, 2014 email response, I am left to conclude it is highly probable his email was written without knowledge of the facts and legal theories contained therein. The information in the Complaint and Exhibits were not part of my earlier letters because drafting was underway, but not complete. The suit speaks for itself; however, I would direct your attention to the Complaint's paragraphs 7, 21, 22, 23, 26, 27, 52, and 53. Furthermore, important provisions are contained in Exhibit I, paragraphs 5, 7, 11, and 12, a secrecy agreement likely similar to one Mr. Snowden executed. What was not said in my earlier letters is this: literary and film rights belong to the U.S. Government, thus my client seeks on behalf of the American people the imposition of the remedy of a constructive trust to be paid to the U.S. Government, not himself. We do not seek a prior restraint of the film itself, but rather disgorgement of monies to provide some restitution for the damage done to our national security when Mr. Snowden went too far.

      A simple analogy is this. Someone can offer to sell you the Brooklyn Bridge and purport to grant you title to it, but because the offeror cannot have clear title to it [title is reposed in the municipality] any documents or contracts purporting to pass title are void as a matter of law. The issue of literary and film rights clearances in all contracts (including insurance) associated with the Academy's February 22, 2015 Oscars Ceremony may be an important concern to the Academy, as well.

**EXHIBIT 1**

Mail: P.O. Box 860548, Shawnee, KS 66286-0548

Ms. Cheryl Boone Isaacs
Ms. Kate Amend
Mr. Rob Epstein
Mr. Alex Gibney
January 4, 2015
Page 2

In all fairness to the Academy, its 15 semifinalist documentarians and your right to interpret your own Rules, I believe you should consider the allegations of breach of fiduciary duty and inherently void title contained in the Complaint, as well as revisit the points raised in my earlier letters. Mr. Miller's response did not address the applicable Rules that were cited as to eligibility, but rather veered off into a "red herring" as to whether a portion of prior material was used. Please refer to the Rules regarding preexisting materials and the year in which eligibility is permissible.

One final note, in Mr. Miller's email, the omission of the names of the Documentary Branch Executive Committee Members, who per the Academy's Rules undertake the responsibility to resolve documentary film eligibility issues, leaves several questions still unanswered: who are the Committee Members and why are their identities cloaked in secrecy? Transparency, due process, and fairness appear lacking, which stand in sharp contrast to the published representations that these hallmarks are inherently-embodied in the Oscars process.[1]

For all these reasons and for any as yet unknown reasons, I ask the Academy to expedite this request for a review of eligibility and provide a more detailed response to me, in writing via email, by 2 p.m. CST, Tuesday, January 6, 2015.

Sincerely,

s/ *Jean Lamfers*
Jean Lamfers
Lamfers & Associates, L.C.

JL/ms
Attachments: *Edwards v. Snowden*, Complaint and Exhibits A through I

cc: Scott Miller, Rules Department

---

[1] See, "Overview" Section of the "Regulations Concerning the Promotion of Films Eligible for the 87th Academy Awards" http://www.oscars.org/oscars/regulations-concerning-promotion-films-eligible-87th-academy-awardsr <last visited on January 4, 2015>

## LAMFERS & ASSOCIATES, L.C.
Attorneys at Law

Jean Lamfers*      7003 Martindale Road      *Admitted in Missouri & Kansas
                   Shawnee, Kansas 66218
                   E-Mail jl@lamferslaw.com
                   www.lamferslaw.com

December 12, 2014

(913) 962-8200

Ms. Cheryl Boone Isaacs, President
Ms. Kate Amend
Mr. Rob Epstein                          Sent via Email ONLY c/o
Mr. Alex Gibney                          smiller@oscars.org
Documentary Branch Executive Committee   **Please Forward to Recipients**
The Academy of Motion Picture Arts and Sciences
8949 Wilshire Boulevard
Beverly Hills, CA 90211

Re:   Additional Information for Consideration
      Eligibility Determination Request, "Citizenfour" Documentary, 87th Academy Awards

Dear Ms. Isaacs, Ms. Amend, and Messrs. Epstein and Gibney:

In furtherance to my letter of December 9, 2014, I would like to provide additional information for your consideration. The Academy might find it helpful to view some historical context, in the public domain, relevant to the nontheatrical evolution of the film at the following URLs:

2012 https://web.archive.org/web/20120501000000*/http://www.praxisfilms.org/about/laura-poitras

2013 https://web.archive.org/web/20130415000000*/http://www.praxisfilms.org/about/laura-poitras

2014 https://web.archive.org/web/20140401000000*/http://www.praxisfilms.org/about/laura-poitras

Each URL takes you to a year and should show a snapshot of the web page and contents of the Website.

Thank you for your time and consideration of the eligibility determination request. I look forward to the Academy's response to me, in writing via email, by noon CST, Monday, December 15.

Sincerely,

*s/Jean Lamfers*
Jean Lamfers
Lamfers & Associates, L.C.

JL/ms

Subject: RE: Eligibility Determination Request, "Citizenfour" Documentary, 87th Academy Awards

From: Scott Miller

To: 'Jean Lamfers'

Date: 2014-12-22 08:59 PM

Dear Ms. Lamfers:

I am responding on behalf of the Academy to your correspondence regarding *Citezenfour*. We appreciate your concern for the integrity of our awards process and for taking the time to provide this information. However, the Academy has already determined that *Citezenfour* is an eligible documentary, and this decision has not changed. The Academy is the final arbiter of its rules and does not, and as a practical matter cannot, provide the review you requested. Nevertheless, I can tell you that we do not consider the videos from *The Guardian* to be an earlier version or release of *Citezenfour*. In fact, less than 2 minutes of such footage is used in the film.

Very truly yours,

Scott Miller

SCOTT MILLER
Assistant General Counsel and Managing Director of Administration
Academy of Motion Picture Arts and Sciences
8949 Wilshire Blvd. · Beverly Hills, CA 90211
310.247.3750 · smiller@oscars.org

**From:** Jean Lamfers [mailto:jl@lamferslaw.com]
**Sent:** Tuesday, December 09, 2014 4:03 PM
**To:** Scott Miller
**Subject:** Eligibility Determination Request, "Citizenfour" Documentary, 87th Academy Awards

Dear Mr. Miller,

In furtherance to our phone conversation of last week in which I requested the names of the Documentary Branch Executive Committee Members and you declined to provide them, as did Tom Oyer of your offices, I am directing this email to your attention for further handling.

Therefore, I am sending the attached letter addressed to those 3 individuals identified as Documentary Branch Members on the Board of Governors page of the Oscars Website, as well as to Ms. Isaacs, Board of Governors President. Should the named individuals not comprise the Documentary Branch Executive Committee with authority to resolve eligibility questions under the rules, I request you promptly forward their respective letters and attachments to the appropriate individuals.

Thank you in advance for your assistance.

Regards, Jean Lamfers

--

Jean Lamfers
Lamfers & Associates, L.C.
7003 Martindale Rd.
Shawnee, KS 66218
(913) 962-8200
jl@lamferslaw.com

## LAMFERS & ASSOCIATES, L.C.
### Attorneys at Law

Jean Lamfers*

7003 Martindale Road
Shawnee, Kansas 66218
E-Mail jl@lamferslaw.com
www.lamferslaw.com

*Admitted in Missouri & Kansas

December 9, 2014

(913) 962-8200

Ms. Cheryl Boone Isaacs, President
Ms. Kate Amend
Mr. Rob Epstein
Mr. Alex Gibney
Documentary Branch Executive Committee[1]
The Academy of Motion Picture Arts and Sciences
8949 Wilshire Boulevard
Beverly Hills, CA 90211

Sent via Fed Ex and Email
smiller@oscars.org

Re: Eligibility Determination Request, "Citizenfour" Documentary, 87th Academy Awards

Dear Ms. Isaacs, Ms. Amend, and Messrs. Epstein and Gibney:

I write on behalf of a client who, after seeing the film "Citizenfour," has requested I contact the Academy and formally inquire whether the film, produced and directed by Laura Poitras/Praxis Films, Inc., should be eligible for any Nomination by the Academy given the specific limitations set forth in the Special Rules for the Documentary Awards, as well as under applicable law.

In reviewing the Rules at my client's behest, I note several requirements that affect the film's eligibility for any Nomination for an Academy Award at any time.

I refer to the documentary requirement mandating "[f]ilms that, in any version, receive a nontheatrical public exhibition or distribution before their first qualifying theatrical release, will not be eligible for Academy Awards consideration." Rule Eleven, III., A., 9. (*Emphasis in the original.*)

One key fact is Ms. Poitras and Praxis Films, Inc. on June 6, 2013 released a "nontheatrical public exhibition" of a documentary film about Mr. Snowden, which is a "version" (see below) of "Citizenfour." The June 6, 2013 film aired and received extensive public attention via The Guardian newspaper website in conjunction with a news article. *See story attached.* Subsequently, the film was distributed and aired on "PBS News Hour," as well as broadcast, cable television, web and various internet media. The worldwide distribution of the film, in any version, through these media would appear to trigger mandatory Academy ineligibility as "nontheatrical public exhibitions or distribution" under the definition contained in Rule Eleven, III., A., 9.

Additionally, the fact the June 6, 2013 film was at least 12 minutes and 33 seconds in length, exceeds the Academy's restriction limiting to ten (10) minutes or ten percent of the running time of a film, whichever is shorter, in any nontheatrical medium prior to the film's theatrical release.[2] Five DVDs of the June 6, 2013 film are enclosed for your ease of review and consideration of this 10-minute restriction.

---

[1] Based on the Academy's website and its list of Board of Governor members, we believe these individuals compose the Documentary Branch Executive Committee; however, if this assumption is incorrect, we request this letter and attachments be forwarded to the proper individuals for their determination per the Rules.
[2] The feature length is 114 minutes; therefore, the 10-minute restriction applies.

Mail: P.O. Box 860548, Shawnee, KS 66286-0548

Ms. Cheryl Boone Isaacs
Ms. Kate Amend
Mr. Rob Epstein
Mr. Alex Gibney
December 9, 2014
Page 2

  Furthermore, Rule Eleven, III., A., 7. provides "[o]nly individual documentary works are eligible. This excludes from consideration: episodes extracted from a larger series, segments taken from a single "composite" program, and alternate versions of ineligible works." When examined under this Rule and the applicable facts, the Executive Committee has a reasonable basis under the Rules to conclude "Citizenfour" constitutes an alternate version of an ineligible work released non-theatrically on June 6, 2013. The Rules do not provide for a cure by simply cutting or remixing the June 2013 footage within a longer version of a feature length film. Therefore, under the plain meaning of the Rules, eligibility for an Academy Nomination for the film "Citizenfour" must be reviewed and determined by the Executive Committee and if ineligible, the Nomination would not be valid.

  In addition, the Documentary Branch Executive Committee should note that under Rule Eleven, III., A., 3., the June 6, 2013 film, at a run time of 12 minutes and 34 seconds, might have qualified in 2013 for the 86th Academy Awards Documentary Short Subject, had it been otherwise eligible under the theatrical release restrictions. However, the effect of Rule Eleven, III., A., 3., which says "[t]he picture must be submitted in the same Awards year in which it first qualifies," may also have an additional effect on 2014 eligibility. For the 87th Academy Awards, the eligibility period for documentary features begins on January 1, 2014, and ends on December 31, 2014. The nontheatrical exhibition of a film in excess of ten minutes in length in June 2013, used as the basis for a Feature length version, i.e., an "alternate version of an ineligible work," therefore may raise an additional bar to 2014 eligibility in the Documentary Feature category, given the evident purpose of the Rules, which construed collectively, should exclude this exact situation.

  For all the reasons set forth above, as well as any additional reasons under applicable statutory and/or common law given the specific factual circumstances of both the 2013 and 2014 versions of the film, I request, on behalf of my client and the American viewing public, a formal review of the film's eligibility by the Documentary Branch Executive Committee and the Board of Governors. I ask the Academy to expedite this request for a review of eligibility under any Academy category and provide a response to me, in writing via email, by noon CST, Monday, December 15.

Sincerely,

*s/Jean Lamfers*
Jean Lamfers
Lamfers & Associates, L.C.

JL/ms
Attachments: 5 DVDs Poitras/Snowden June 6, 2013
      Guardian Newspaper Article June 6, 2013

cc: Scott Miller, Rules Department



# Edward Snowden: the whistleblower behind the NSA surveillance revelations

The 29-year-old source behind the biggest intelligence leak in the NSA's history explains his motives, his uncertain future and why he never intended on hiding in the shadows

. Q&A with NSA whistleblower Edward Snowden: 'I do not expect to see home again'

Glenn Greenwald, Ewen MacAskill and Laura Poitras in Hong Kong
Tuesday 11 June 2013 09.00 EDT



The individual responsible for one of the most significant leaks in US political history is Edward Snowden, a 29-year-old former technical assistant for the CIA and current employee of the defence contractor Booz Allen Hamilton. Snowden has been working at the National Security Agency for the last four years as an employee of various outside contractors, including Booz Allen and Dell.

The Guardian, after several days of interviews, is revealing his identity at his request. From the moment he decided to disclose numerous top-secret documents to the public, he was determined not to opt for the protection of anonymity. "I have no intention of hiding who I am because I know I have done nothing wrong," he said.

Snowden will go down in history as one of America's most consequential whistleblowers, alongside Daniel Ellsberg and Bradley Manning. He is responsible for handing over material from one of the world's most secretive organisations – the NSA.

In a note accompanying the first set of documents he provided, he wrote: "I understand that I will be made to suffer for my actions," but "I will be satisfied if the federation of secret law, unequal pardon and irresistible executive powers that rule the world that I love are revealed even for an instant."

Despite his determination to be publicly unveiled, he repeatedly insisted that he wants to avoid the media spotlight. "I don't want public attention because I don't want the story to be about me. I want it to be about what the US government is doing."

He does not fear the consequences of going public, he said, only that doing so will distract attention from the issues raised by his disclosures. "I know the media likes to personalise political debates, and I know the government will demonise me."

Despite these fears, he remained hopeful his outing will not divert attention from the substance of his disclosures. "I really want the focus to be on these documents and the debate which I hope this will trigger among citizens around the globe about what kind of world we want to live in." He added: "My sole motive is to inform the public as to that which is done in their name and that which is done against them."

He has had "a very comfortable life" that included a salary of roughly $200,000, a girlfriend with whom he shared a home in Hawaii, a stable career, and a family he loves. "I'm willing to sacrifice all of that because I can't in good conscience allow the US government to destroy privacy, internet freedom and basic liberties for people around the world with this massive surveillance machine they're secretly building."

## 'I am not afraid, because this is the choice I've made'

Three weeks ago, Snowden made final preparations that resulted in last week's series of blockbuster news stories. At the NSA office in Hawaii where he was working, he copied the last set of documents he intended to disclose.

He then advised his NSA supervisor that he needed to be away from work for "a couple of weeks" in order to receive treatment for epilepsy, a condition he learned he suffers from after a series of seizures last year.

As he packed his bags, he told his girlfriend that he had to be away for a few weeks, though he said he was vague about the reason. "That is not an uncommon occurrence for someone who has spent the last decade working in the intelligence world."

On May 20, he boarded a flight to Hong Kong, where he has remained ever since. He chose the city because "they have a spirited commitment to free speech and the right of political dissent", and because he believed that it was one of the few places in the world that both could and would resist the dictates of the US government.

In the three weeks since he arrived, he has been ensconced in a hotel room. "I've left the room maybe a total of three times during my entire stay," he said. It is a plush hotel and, what with eating meals in his room too, he has run up big bills.

He is deeply worried about being spied on. He lines the door of his hotel room with pillows to prevent eavesdropping. He puts a large red hood over his head and laptop when entering his passwords to prevent any hidden cameras from detecting them.

Though that may sound like paranoia to some, Snowden has good reason for such fears. He worked in the US intelligence world for almost a decade. He knows that the biggest and most secretive surveillance organisation in America, the NSA, along with the most powerful government on the planet, is looking for him.

Since the disclosures began to emerge, he has watched television and monitored the internet, hearing all the threats and vows of prosecution emanating from Washington.

And he knows only too well the sophisticated technology available to them and how easy it will be for them to find him. The NSA police and other law enforcement officers have twice visited his home in Hawaii and already contacted his girlfriend, though he believes that may have been prompted by his absence from work, and not because of suspicions of any connection to the leaks.

"All my options are bad," he said. The US could begin extradition proceedings against him, a potentially problematic, lengthy and unpredictable course for Washington. Or the Chinese government might whisk him away for questioning, viewing him as a useful source of information. Or he might end up being grabbed and bundled into a plane bound for US territory.

"Yes, I could be rendered by the CIA. I could have people come after me. Or any of the third-party partners. They work closely with a number of other nations. Or they could pay off the Triads. Any of their agents or assets," he said.

"We have got a CIA station just up the road – the consulate here in Hong Kong – and I am sure they are going to be busy for the next week. And that is a concern I will live with for the rest of my life, however long that happens to be."

Having watched the Obama administration prosecute whistleblowers at a historically unprecedented rate, he fully expects the US government to attempt to use all its weight to punish him. "I am not afraid," he said calmly, "because this is the choice I've made."

He predicts the government will launch an investigation and "say I have broken the Espionage Act and helped our enemies, but that can be used against anyone who points out how massive and invasive the system has become".

The only time he became emotional during the many hours of interviews was when he pondered the impact his choices would have on his family, many of whom work for the US government. "The only thing I fear is the harmful effects on my family, who I won't be able

to help any more. That's what keeps me up at night," he said, his eyes welling up with tears.

## 'You can't wait around for someone else to act'

Snowden did not always believe the US government posed a threat to his political values. He was brought up originally in Elizabeth City, North Carolina. His family moved later to Maryland, near the NSA headquarters in Fort Meade.

By his own admission, he was not a stellar student. In order to get the credits necessary to obtain a high school diploma, he attended a community college in Maryland, studying computing, but never completed the coursework. (He later obtained his GED.)

In 2003, he enlisted in the US army and began a training program to join the Special Forces. Invoking the same principles that he now cites to justify his leaks, he said: "I wanted to fight in the Iraq war because I felt like I had an obligation as a human being to help free people from oppression".

He recounted how his beliefs about the war's purpose were quickly dispelled. "Most of the people training us seemed pumped up about killing Arabs, not helping anyone," he said. After he broke both his legs in a training accident, he was discharged.

After that, he got his first job in an NSA facility, working as a security guard for one of the agency's covert facilities at the University of Maryland. From there, he went to the CIA, where he worked on IT security. His understanding of the internet and his talent for computer programming enabled him to rise fairly quickly for someone who lacked even a high school diploma.

By 2007, the CIA stationed him with diplomatic cover in Geneva, Switzerland. His responsibility for maintaining computer network security meant he had clearance to access a wide array of classified documents.

That access, along with the almost three years he spent around CIA officers, led him to begin seriously questioning the rightness of what he saw.

He described as formative an incident in which he claimed CIA operatives were attempting to recruit a Swiss banker to obtain secret banking information. Snowden said they achieved this by purposely getting the banker drunk and encouraging him to drive home in his car. When the banker was arrested for drunk driving, the undercover agent seeking to befriend him offered to help, and a bond was formed that led to successful recruitment.

"Much of what I saw in Geneva really disillusioned me about how my government functions and what its impact is in the world," he says. "I realised that I was part of something that was doing far more harm than good."

He said it was during his CIA stint in Geneva that he thought for the first time about exposing government secrets. But, at the time, he chose not to for two reasons.

First, he said: "Most of the secrets the CIA has are about people, not machines and systems, so I didn't feel comfortable with disclosures that I thought could endanger anyone". Secondly, the election of Barack Obama in 2008 gave him hope that there would be real reforms, rendering disclosures unnecessary.

He left the CIA in 2009 in order to take his first job working for a private contractor that assigned him to a functioning NSA facility, stationed on a military base in Japan. It was then, he said, that he "watched as Obama advanced the very policies that I thought would be reined in", and as a result, "I got hardened."

The primary lesson from this experience was that "you can't wait around for someone else to act. I had been looking for leaders, but I realised that leadership is about being the first to act."

Over the next three years, he learned just how all-consuming the NSA's surveillance activities were, claiming "they are intent on making every conversation and every form of behaviour in the world known to them".

He described how he once viewed the internet as "the most important invention in all of human history". As an adolescent, he spent days at a time "speaking to people with all sorts of views that I would never have encountered on my own".

But he believed that the value of the internet, along with basic privacy, is being rapidly destroyed by ubiquitous surveillance. "I don't see myself as a hero," he said, "because what I'm doing is self-interested: I don't want to live in a world where there's no privacy and therefore no room for intellectual exploration and creativity."

Once he reached the conclusion that the NSA's surveillance net would soon be irrevocable, he said it was just a matter of time before he chose to act. "What they're doing" poses "an existential threat to democracy", he said.

## A matter of principle

As strong as those beliefs are, there still remains the question: why did he do it? Giving up his freedom and a privileged lifestyle? "There are more important things than money. If I were motivated by money, I could have sold these documents to any number of countries and gotten very rich."

For him, it is a matter of principle. "The government has granted itself power it is not entitled to. There is no public oversight. The result is people like myself have the latitude to go further than they are allowed to," he said.

His allegiance to internet freedom is reflected in the stickers on his laptop: "I support Online Rights: Electronic Frontier Foundation," reads one. Another hails the online organisation offering anonymity, the Tor Project.

Asked by reporters to establish his authenticity to ensure he is not some fantasist, he laid bare, without hesitation, his personal details, from his social security number to his CIA ID

and his expired diplomatic passport. There is no shiftiness. Ask him about anything in his personal life and he will answer.

He is quiet, smart, easy-going and self-effacing. A master on computers, he seemed happiest when talking about the technical side of surveillance, at a level of detail comprehensible probably only to fellow communication specialists. But he showed intense passion when talking about the value of privacy and how he felt it was being steadily eroded by the behaviour of the intelligence services.

His manner was calm and relaxed but he has been understandably twitchy since he went into hiding, waiting for the knock on the hotel door. A fire alarm goes off. "That has not happened before," he said, betraying anxiety wondering if was real, a test or a CIA ploy to get him out onto the street.

Strewn about the side of his bed are his suitcase, a plate with the remains of room-service breakfast, and a copy of Angler, the biography of former vice-president Dick Cheney.

Ever since last week's news stories began to appear in the Guardian, Snowden has vigilantly watched TV and read the internet to see the effects of his choices. He seemed satisfied that the debate he longed to provoke was finally taking place.

He lay, propped up against pillows, watching CNN's Wolf Blitzer ask a discussion panel about government intrusion if they had any idea who the leaker was. From 8,000 miles away, the leaker looked on impassively, not even indulging in a wry smile.

Snowden said that he admires both Ellsberg and Manning, but argues that there is one important distinction between himself and the army private, whose trial coincidentally began the week Snowden's leaks began to make news.

"I carefully evaluated every single document I disclosed to ensure that each was legitimately in the public interest," he said. "There are all sorts of documents that would have made a big impact that I didn't turn over, because harming people isn't my goal. Transparency is."

He purposely chose, he said, to give the documents to journalists whose judgment he trusted about what should be public and what should remain concealed.

As for his future, he is vague. He hoped the publicity the leaks have generated will offer him some protection, making it "harder for them to get dirty".

He views his best hope as the possibility of asylum, with Iceland - with its reputation of a champion of internet freedom - at the top of his list. He knows that may prove a wish unfulfilled.

But after the intense political controversy he has already created with just the first week's haul of stories, "I feel satisfied that this was all worth it. I have no regrets."