UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| EDWARDS, HORACE B., et al <br> Plaintiff(s), <br> v. <br> SNOWDEN, EDWARD JOSEPH, et al <br> Defendant(s) | ) <br> ) <br> ) <br> ) Civil Action No.2:14-CV-2631 <br> ) <br> ) <br> ) <br> ) |

AFFIDAVIT OF DAVID B. SMALLMAN

**WITNESSETH:**

I, DAVID B. SMALLMAN, having been duly sworn do hereby declare as follows:

 1. I submit this Affidavit ("Affidavit") in connection with the above-captioned action. I am over eighteen years of age and am a citizen of the United States. I make this Affidavit based upon personal and public knowledge. Unless indicated otherwise, I have personal knowledge of the facts stated herein, either based upon personal, firsthand experience or by having reviewed documents that have refreshed my recollection of facts known to me, and, if called as a witness, would competently testify thereto.

### A. GENERAL SUMMARY

 2. I am an attorney admitted and licensed to practice law in the State of New York and State of Connecticut, and am admitted to practice before numerous Federal District and Appellate Courts as well as the United States Supreme Court. My business address is 276 Fifth Avenue, Suite 805, New York, New York, 10001.

 3. I submit this Affidavit because I have personal knowledge of facts, which I believe will be helpful to this Court in evaluating certain issues in dispute between the parties. As described more fully below, based on my years of experience providing legal

**EXHIBIT 15**

services to certain individuals in the intelligence community who have created books, films, and other materials relating to their professional experiences, I am aware of a number of the customary and required means by which such works are approved for publication by the United States government. Moreover, based on my personal interactions with individuals involved in the production of the instant film, *CITIZENFOUR*, which I viewed on October 10, 2014 at its premiere at the New York Film Festival, I have personal knowledge that those individuals were fully aware of those requirements. Until that date I did not know the extent to which my personal knowledge might be relevant to any issues involving *CITIZENFOUR*.

### B. EXPERIENCE

4.   As a lawyer who concentrates in, among other things, intellectual property, media law, E&O insurance advice, national security law, publishing matters, complex insurance coverage disputes, and insurance fraud, I am aware that it is necessary to know and abide by the well-established law of the United States of America, *see, e.g., Snepp v. U.S.*, 444 U.S. 507 (1980), Executive Order 13526, as amended, and civil and criminal regulations and statutes when current or former intelligence professionals seek to write books, option or sell movie rights relating to their professional experiences and information covered by their secrecy agreements, and/or benefit in other ways from their relationship with the U.S. intelligence community, including its components and agencies.

5.   I am aware that those secrecy agreements customarily and traditionally contain, among other provisions, three provisions especially relevant hereto. The agreements (a) repose and control title to the property of the United States through its representative government to information covered by the secrecy agreement, (b) assign

2

title to the United States through its representative government to information covered by the secrecy agreement, which signatories may otherwise attempt to option, sell or publish in any books, films or other public appearances, and (c) require signatories to those agreements, before gaining access to classified information, to affirm in writing that they will, among other things, disgorge any funds arising from any violation of such title provisions, whether by sale, attempted assignment or otherwise.[1] I am not aware of any exception to the foregoing during my more than twenty years of practice as a lawyer.

  6. From in or about 2007, to in or about 2012, I represented former Central Intelligence Agency Officer Valerie Plame Wilson. I was lead counsel to Ms. Wilson and co-counsel to publisher Simon & Schuster, Inc. ("Simon & Schuster"), a part of the CBS Corporation, in connection with obtaining clearance from the CIA relative to the publication of Ms. Wilson's book, *Fair Game*. In that book, and after litigation, *Wilson v. C.I.A.*, 586 F.3rd 171 (2nd Cir., 2009), and following clearance in redacted form by the CIA, Ms. Wilson discussed, among other things, the permitted aspects of her career and clandestine assignments at the CIA.

  7. I also became familiar, through representation of film company River Road Entertainment in connection with the film FAIR GAME, of the proper procedures for movie companies and their producers for clearing films involving secret and/or classified information and helping them comply with the requirements for submitting and obtaining valid errors and omissions insurance policies.

---

[1] The prevalence of secrecy agreements executed by intelligence officials before being permitted to gain access to classified information and the restrictions attendant to those agreements are widely known in the film and publishing industry and knowledge of them is reflected in numerous court cases. *See, e.g., U.S. v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972); *U.S. v. Ishmael Jones*, No. 10-cv-00765-GBL-TRJ (E.D. Va. 2012).

### C. THE LAWSUIT

8.  In *Wilson v. CIA*, *infra*, the Second Circuit specifically held that mere presence of classified information in the public domain does not have the legal or practical effect of declassifying information, but rather declassification can only occur by following the prescribed procedures in applicable Executive Orders or law.

9.  Having undertaken a search of legal and public sources for any acknowledgment by Executive or court order under such prescribed procedures, and having found none, I affirm, upon information and belief, I am not aware that any such declassification of the classified information disclosed in the film *CITIZENFOUR* has occurred, except as otherwise stated herein. To the contrary, Mr. Snowden has a pending criminal complaint filed against him for precisely such conduct – unauthorized disclosure of classified information to "Persons" pursuant to federal statute.

### D. CONDUCT REGARDING DEFENDANTS PARTICIPANT MEDIA, DIANE WEYERMANN AND JEFFREY SKOLL

10.  Participant Media's Executive Vice President, Documentary Feature Films, and a named defendant in this litigation, Diane Weyermann, was not publicly identified, to the best of my reasonable knowledge, in published lists of cast and crew credits for *FAIR GAME,* but was nevertheless substantially involved as discussed below. Moreover, Participant Media's founder and current Chairman, Jeffrey Skoll (also a named defendant in this litigation) is listed in the credits for *FAIR GAME* as an Executive Producer.[2]

11.  Neither my law firm nor I have ever been engaged as legal counsel by

---

[2] To the best of my knowledge, Participant Media and River Road Entertainment are entirely distinct entities, with no commonality of ownership or control. As noted below, I have never represented Participant Media or for that matter, Jeffrey Skoll.

4

Ms. Weyermann, or by any entity in which Ms. Weyermann has been employed.[3] I am aware, however, that Ms. Weyermann has a legal background, having completed law school and practiced law.

12. In or about 2011, in furtherance of my representation of Ms. Wilson, I had a number of discussions with Ms. Weyermann and others regarding the proper protocol for communicating with Ms. Wilson as it related to matters covered by Ms. Wilson's secrecy agreement with the CIA. Ms. Weyermann knew that I represented Ms. Wilson in a lawsuit about CIA redactions and had significant experience with secrecy orders applicable to intelligence officers, movies, and related E&O insurance issues. On multiple occasions, I informed Ms. Weyermann that, under no circumstances should there be any communication with Ms. Wilson regarding *any* information about Ms. Wilson's life that was subject to Ms. Wilson's secrecy agreement, without prior authorization from the relevant government authorities. I stressed this point repeatedly with other individuals involved in the film *FAIR GAME* because of the potentially serious economic and other consequences that my client, Ms. Wilson, could have otherwise faced.

13. I provided non-confidential information to Ms. Weyermann about my experience with risk management clearance procedures for biopics and documentaries relevant to that topic. I also shared with Ms. Weyermann certain public legal information (including by referencing court decisions, rules, and laws) governing the CIA officers' obligations under the secrecy agreements they must sign as members of the U.S. intelligence community. During these discussions with Ms. Weyermann, I explained specifically that CIA employees are *routinely* obligated to assign to the United

---

[3] I note that from approximately March to November, 2011, I was engaged in a personal relationship with Ms. Weyermann.

5

States all right, title and interest to the secrets, confidential information, classified information and other information to which they are given access as fiduciaries of the American people in their role as members of the intelligence community. Moreover, I explained the duties of U.S. intelligence professionals not to disclose certain information covered by their secrecy agreements, and *also* explained the negative consequences to such individuals -- and those with whom they work or collaborate on movies -- of unauthorized disclosure of classified information.

14.     I further explained to Ms. Weyermann that movie, film, television, radio and other rights, which arise from knowledge obtained as intelligence officers and are conferred as a precondition of their employment (or contractual relationship) with the United States, may not be assigned or given *to anyone* without government preauthorization. I also told Ms. Weyermann that the "chain of title" cannot pass to a film company unless and until the U.S. entity in question provides express written authorization for title to pass or a court orders title to the property, intellectual property or knowledge to pass, and that serious insurance issues putting a film's distribution qualification at risk can arise when title fails to pass in the appropriate manner.

15.     More particularly, as part of explaining to Ms. Weyermann the reasons why neither she nor Participant Media could discuss with Ms. Wilson any information covered by Ms. Wilson's secrecy agreement, I also related to Ms. Weyermann the legal history and rationale underlying the Supreme Court's landmark decision in *Snepp v. U.S.*, 444 U.S. 507 (1980). In addition to proper insurance application procedures necessary to refrain from improperly using classified information and required practices for complying with E&O insurance policies for films, I emphasized to Ms. Weyermann the Supreme Court's endorsement of the use of a constructive trust to deter violations of

6

secrecy agreements by intelligence professionals and others.

16. Ms. Wyermann, in the course of my explanations to her about *FAIR GAME* and related information about E&O insurance applications and non-disclosure requirements under the law applicable to current and former CIA officers, provided me with details of her educational background and attendance at film school. This included her 1992 documentary film, *MOSCOW WOMEN – ECHOES OF YAROSLAVNA,* which Ms. Weyermann directed, edited, and produced and which was shot in Moscow, Russia over an extended period of time. She also discussed with me during 2011 her job history, including seven years as Director of the Open Society Institute ("OSI") of New York's Arts and Culture Program – which she started two years after her film work in Moscow – and her role in OSI's efforts abroad to effect change in foreign public opinion about social and political issues.

17. Also in the course of my explanations to Ms. Weyermann about *FAIR GAME* and related topics, she told me of her involvement in obtaining funds provided by George Soros, delivery of monetary grants, and other support from OSI to various foreign film and arts organizations, her oversight of a documentary fund at OSI, and her experiences in that position, including her sophistication regarding artistic matters and public affairs, overseas cultural issues, and global activism through extensive international travel, including Eastern Europe and adjacent countries. She informed me of her highly influential status in the documentary film industry after the transfer of the Soros documentary film fund to the Sundance Institute and her subsequent role as director of the Sundance Institute's documentary program.

18. Ms. Weyermann appeared greatly interested in the information I provided about *FAIR GAME* and related clearance issues for government information

and E&O insurance application requirements because I understood she was responsible for Participant Media's slate of documentary films and had and has responsibility for the economic impact of decisions she makes in that role regarding documentaries approved by her and accepted for production or other forms of participation by Participant Media.

19. Upon information and belief, Ms. Weyermann is personally rewarded for the financial or other forms of success she achieves, including monetary bonuses, public accolades, film awards, social impact, and media coverage of movies that she recommends and oversees for Participant Media.

20. In addition to discussing the serious consequences *Snepp* imposes on intelligence officers and others with whom they collaborate, my explanations to Ms. Weyermann on this point included references to other decisional law as well as administrative procedures utilized by intelligence agencies to impose equitable remedies including constructive trusts. I informed Ms. Weyermann that (1) these remedies could include recovery from *any* parties in the chain of title for *any* resultant costs and damages incurred by the United States and (2) *any* such parties could be subject to disgorgement for violating applicable laws and regulations that concerned information covered by secrecy agreements. I further informed Ms. Weyermann that disgorgement of revenues -- as well as separate civil claims -- could be brought in litigation against third parties in order to recover the monetary harm, damages, costs incurred by the United States involved in enforcing applicable laws and secrecy agreements, and that these remedies could be imposed and available in circumstances in which third party moviemakers were required to comply with those laws but failed to do so.

### D. The Film *CITIZENFOUR*

21. I previously represented Praxis Films, Inc. in connection with, among

other things, the film *THE OATH*. My point of contact at Praxis Films, Inc. was Laura Poitras. My representation, to the best of my recollection, ended on or about mid-2011. I have not subsequently participated in any way, in my personal capacity or as a lawyer, in the representation of Ms. Poitras, Praxis Films, Inc. or the film *CITIZENFOUR*.

22. I am aware based upon my personal experience in assisting clients with and applying for E&O insurance for numerous feature films and documentaries, that applicants are required to provide, among other things, accurate information to the proposed insurer before and after a policy has been bound and issued.

23. I am not aware that any classified information contained in *CITIZENFOUR* has been declassified, except that I am aware that U.S. authorities may have confirmed that Mr. Snowden was a self-admitted undercover senior CIA, NSA, DIA advisor/officer and/or contractor for the NSA. I am also aware that a limited amount of information contained in the film *CITIZENFOUR* and a related 2013 film does contain some unclassified information.

### E. CONCLUSION

24. Upon information and belief, Ms. Weyermann and Participant Media knew that the dissemination of certain information contained in *CITIZENFOUR* was unlawful absent the procedures for review and insurance application requirements I previously described extensively to Ms. Weyermann; clear title could not pass to the defendants, including in their respective capacities as insureds or covered persons or entities (for example, Participant Media) under E&O insurance ostensibly obtained for *CITIZENFOUR* (and any other related film such as PRISM, shown on Frontline/PBS in 2013) because of the admitted theft by Mr. Snowden of information covered by his secrecy agreements; and that this knowledge, combined with active participation in the

production of *CITIZENFOUR* under such circumstances, could subject Ms. Weyerman, Participant Media, and Jeffrey Skoll, along with other defendants and additional third parties to potential legal claims and damages.

Further Affiant sayeth naught.

STATE OF __Kansas__ )
                    ) ss.
COUNTY OF __Wyandotte__ )

    I am the Affiant named herein. I have read the above and foregoing Affidavit of David B. Smallman, and am familiar with the contents thereof, and all the declarations made therein are true and correct.

_____
DAVID B. SMALLMAN

    SIGNED AND SWORN to before me on __February 8__, 2015 by David B. Smallman.

_____
Notary Public in and for said County and State

RONDA L. JONES
My Appt. Exp. 5-2-15
STATE OF KANSAS

My appointment expires: __May 2, 2015__

10